Murphy, J.
The plaintiffs, United Technologies Corporation and several of its wholly owned subsidiaries and divisions {collectively, “UTC”), bring this action for contract damages and for a declaration of the rights and obligations of the parties under certain general liability insurance agreements with respect to the plaintiffs’ past, present, and future liabilities. Plaintiffs’ liabilities arise from environmental claims resulting from their manufacturing operations and hazardous waste disposal practices.
I. BACKGROUND
UTC is a diversified corporation with business operations located throughout the United States. It is a broad-based designer and manufacturer of high technology products operating approximately 300 plants and maintaining sales and service offices in 57 countries around the world.
UTC has incurred various environmental liabilities at many locations throughout the United States. In recent years, the plaintiffs have been notified by federal and numerous state environmental agencies that they may be liable as potentially responsible parties (PRPs) for groundwater, surface water, and soil contamination at 122 sites located in 26 states. UTC seeks coverage for cleanup, remediation, and other costs *93 under the primary and excess insurance policies issued to them by the defendants. In particular, UTC seeks coverage from its primary insurer, the defendant Liberty Mutual Insurance Company (Liberty), which at various times from 1951 to 1985, issued commercial general liability (CGL) insurance policies to UTC.
UTC, in its Second Amended Complaint, alleges that the defendant insurance companies agreed to indemnify the plaintiffs against certain environmental liabilities. These liabilities arose from property damage caused by groundwater, surface water, soil and other contamination, alleged in proceedings by the United States Environmental Protection Agency (EPA), state environmental agencies, or other third parties.
The plaintiffs further say that EPA has sent PRP letters notifying UTC of pollution at certain sites, and has commenced claims against them in regard to some of these sites. UTC argues that the policies utilize standard insurance terminology developed by the insurance industry which were intended to and did cover liability for environmental claims, including gradual environmental damage. The defendant insurers have filed motions for summary judgment as to 15 of the 18 New England sites.
The principal issue for the court to determine is that of coverage under the primary CGL policies issued by Liberty. At this time there is no significant issue in dispute between the plaintiffs and the excess insurers. Therefore, the court will not address the obligations of the excess insurers at this time in detail. By consent of the parties, Count II of the complaint, for damages for breach of contract, is left for another day.
A. The UTC Insurance Program.
UTC crafted an insurance program consisting of primary, excess, and umbrella policies affording multiple layers of coverage in each policy period. Liberty provided primary CGL and other types of coverage during the period of October 1, 1958 to October 1, 1985. The Second Amended Complaint names a multitude of excess and umbrella insurers alleged to have provided additional coverage under more than 1500 identified and listed insurance contracts.
The various policies of the UTC insurance program cover a range of risks including general liability, automobile liability, aircraft grounding liability, workers compensation, and advertising liability.
Plaintiffs have named in the suit the primary insurance policies in effect from October 1, 1958 to October 1, 1985 and the excess and/or umbrella policies in effect from 1963 to 1985. Each insurance contract must be examined in order to determine exactly what coverage is provided by the policy.
All CGL policies typically have five (5) parts, parts of each of which will need to be examined:
1.Declarations. The Declarations set forth specific information concerning the policy including the period of coverage and the limits of liability, and, in excess policies, the underlying limits of coverage. The Declarations also list the named insured or insureds to which coverage is afforded.
2. Grant of Coverage. The Grant of Coverage explains the nature of the coverage afforded and the circumstances under which payment will be made. Coverage in the CGL policy may be modified by endorsements and exclusions.
3. Conditions. The Conditions set forth the conditions under which paymentwillbe considered, such as the requirement of notice.
4. Definitions. The Definitions explain the words used in the policy, such as occurrence, suit, damage and the like.
5. Endorsements. Endorsements are attached as amendments to the basic policy, changing, adding to or eliminating some provision in the main body of the policy. Endorsements are used to tailor a standard CGL policy to the needs and requirements of a particular insured or insurer.
All of the excess and umbrella policies at risk from 1975 to 1985 contained either:
1. a pollution exclusion provision which excluded from coverage all property damage arising out of the discharge or release of pollutants unless caused by a sudden and accidental event; or
2. a clause which excludes from coverage all claims for damage to property arising from seepage, pollution or contamination unless caused by a sudden and unexpected or unintended happening during the policy period.
B. Commercial General Liability (CGL) Policies: In General.
General liability coverage is purely third-party liability coverage designed to compensate the insured for the cost incurred for personal injury or property damage caused by the insured to others, and not for economic or business losses suffered by the insured. It is important to distinguish the CGL policy from a first-party policy wherein the policy covers losses to the property of the insured and not losses or damage to third parties.
The language of the standard CGL policy has been changed by the insurance industry over the years. Before 1966, the standard CGL policy provided coverage for property damage (and personal injury) caused by “accident.” Because appellate courts were inconsistent in deciding whether gradual pollution claims were included in the term “accident,” the CGL policy was revised in 1966 from accident-based coverage to occurrence-based coverage. The term “occurrence” was typically defined as “an accident, including repeated exposure to conditions which results, during the policy period ... in property damage neither expected nor intended from the standpoint of the insured.”
*94 Under the “occurrence” coverage the insurance applies to claims made by third parties based upon occurrences within the polity period that result in injury to third-party property interests.[3] This “occurrence” definition explicitly provided coverage for gradual pollution losses if the losses were not expected or intended by the insured. There was no requirement that the causal event happen abruptly.
Additional revisions were made in the CGL policy in the early 1970s redefining “occurrence” as an “accident, including continuous or repeated exposure to conditions which result in . . . property damage neither expected nor intended from the standpoint of the insured.” This change made it clear that an occurrence included claims based upon exposure to conditions over a period of time. The definition of property damage was also changed to “physical injury to or destruction of tangible property which occurs during the policy period, including loss of use.”
As the number of pollution claims grew in the late 1960s, the language of the CGL policy was changed by the industry to include a pollution exclusion clause. The pollution exclusion clause provided as follows:
Coverage does not apply to . . . property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants, or pollutants into or upon the land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental.
This pollution exclusion clause created an exception to the broad occurrence coverage of the standard CGL policy. Even when an occurrence takes place, the policy does not cover damage resulting from the discharge or release of pollutants. However, the exception to the exclusion at the end of the clause reestablishes coverage if the discharge or release is sudden and accidental.
C. The Liberty Commercial General Liability Policies.
The Liberty policies for the period October 1, 1958 to October 1, 1970, contain no language that specifically refers to pollution claims. In the ten (10) policies issued by Liberty covering the period October 1, 1960 to October 1, 1970, Liberty agreed to pay on behalf of the insured “all claims which the insured shall become legally obligated to pay as damages because of injury to or destruction of property . . . accidentally caused.”
In the section labelled “Policy Period,” each of these ten (10) policies contains temporal restrictions to coverage, including a “deemer” clause:
This policy applies only to . . . injury to or destruction of property, which occurs during the policy period . . . provided that with respect to . . . injury or destruction of property . . . caused by exposure to conditions during a period of days, weeks, months or longer, such injury [or] destruction . . . shall be deemed to occur only on the last day of the last exposure to such conditions. This policy does not apply to . . . destruction . . . caused by such conditions or repeated exposure, any part of which occurs after termination of this policy.
Under the heading “Exclusions,” these policies provide that the policies do not apply to injury to or destruction of property owned by any named insured.
For the policy period October 1, 1970 to October 1, 1971, the Liberty policy added, then deleted, a pollution exclusion clause and replaced it with a new provision entitled “Environmental Pollution and Disturbance Hazard Coverage” (EPDH). The EPDH coverage applies to property damages arising out of environmental, pollution and disturbance hazards occurring prior to or during the policy period, but not after termination of the policy.
Environmental Pollution and Disturbance Hazard means:
[I]njury to or destruction of property arising out of pollution or contamination due to the discharge, dispersal, release, or escape of smoke, vapors, soot, heat, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water ... but does not include such discharge . . . which is sudden and the resultant . . . property damage was neither expected nor intended from the standpoint of the insured.
The effect of this provision is to grant coverage in a limited amount for pollution-caused property damage that is not sudden and accidental.
The Liberty policies for the period October 1, 1971 to October 1, 1983 are essentially the same as the 1970-1971 policy, except that the words “prior to” were deleted. Thus, after 1971, property damage occurring during the policy period was covered but not damage occurring prior to the policy period.
Each of the Liberty policies for the period October 1, 1970 to October 1, 1983 contained an endorsement affording coverage for gradual pollution if other terms and conditions of the policy are met. Although some changes in the language were made in this gradual pollution endorsement, the endorsement will hereinafter be referred to as Endorsement 4. Endorsement 4 excludes abrupt discharges by providing that the endorsement does not include “such discharge ... which is sudden and the resultant. . . property damage was neither expected nor intended from the standpoint of the insured.”
In addition to Endorsement 4, the policy for the period October 1, 1975 to October 1, 1980 contained a separate pollution exclusion endorsement which stated that pollution damage was not covered unless *95 the discharge of pollutants was sudden and accidental. This pollution exclusion by its terms did not apply to operations or occurrences in New Hampshire.
From October 1, 1983 to October 1, 1984, the Liberty policy contained both Endorsement 4 and the pollution exclusion. After October 1, 1984, the pollution exclusion by its terms did not apply to operations or occurrences in New Hampshire.
An absolute pollution exclusion became effective on October 1, 1985. It is not disputed that this provision barred coverage for pollution for any and all releases or discharges whether occurring gradually or suddenly and accidentally.
D. The Excess Insurance Policies, 1962-1978.
During the period January 1, 1968 to January 1, 1970, underwriters at Lloyds, London, and over 200 other London-based insurance companies (collectively, the London Market Insurers), provided first-layer umbrella coverage which generally did not follow the terms and conditions of the Liberty primary policy, but, rather, applied in accordance with its own wording and endorsements.
From January 1, 1962 to October 1, 1978, first-layer excess general liability coverage was provided by London Market Insurers. From October 1, 1975 to January 1, 1978, excess general liability coverage was provided by both London Market Insurers and Lexington Insurance Company. Except as to policy limits, periods, premiums and additional or different terms, conditions, and exclusions set forth in the excess policies, the 1975 to 1978 policies incorporate the terms, definitions, exclusions, and conditions of the underlying Liberty primary policy.
The excess insurers restricted coverage for pollution damage. The London Market policies in effect from 1970 to 1976 contain an absolute pollution exclusion clause. Called an “Environmental Disturbance Exclusion,” the clause provides that the policy does not apply “to damages because of personal injury or property damage arising out of environmental disturbance hazard.”
E. The Excess Insurance Policies, 1978-1979.
The first-layer excess general liability policy issued on behalf of London Market Insurers in effect from October 1, 1978 to October 1, 1979 also incorporated the terms, definitions, exclusions, and conditions of the Liberty primary policy. The additional excess layer policies in effect during this period generally follow either the London Market policy or the Lexington policy. The 1975 to 1979 policies do not incorporate all of the Liberty terms.
The definition of the term “occurrence” in the London Market policies differs from that in the underlying Liberty policies. The London Market policies define the term as:
[An] accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly, and unintentionally results in . . . property damage . . . during the policy period.
The London Market policies state that:
[Liability shall attach to the underwriters only after the underlying insurers have paid, or have been held liable to pay, the full amount of their respective net loss liability
All of the excess policies at risk from 1970 to 1985 contained either a pollution exclusion clause or a seepage, pollution, and contamination clause. The pollution exclusion clause excludes from coverage all personal injury and property damage arising out of the discharge' or release of pollution, unless the discharge or release was sudden and accidental. The seepage,' pollution, and contamination clause excludes from coverage all claims for personal injury or damage to property arising from seepage, pollution, or contamination, unless caused by a sudden and unexpected or unintended happening during the policy period.
The London Market policies all include an “Industries, Seepage, Pollution and Contamination Clause No. 3,” which states:
This insurance does not cover any liability for: (1) . . . loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution, or contamination,. .. [except] where such seepage, pollution, or contamination is caused by a sudden, unintended or unexpected happening during the period of this insurance.
Form NMA 1685. The Lexington policy effective October 1, 1977, contains the same clause, as well as an absolute pollution exclusion, which applies when there is less than $10,000,000 in coverage available under the Liberty policy.
F.The Excess Insurance Policies, 1979-1985.
From October 1,1979 to October 1,1982, first-layer umbrella and excess coverage was provided by Northbrook Excess and Surplus Insurance Company (Northbrook), formerly Northbrook Insurance Company and Northbrook Indemnity. Thereafter, first-layer umbrella coverage was provided by London Market Insurers. The umbrella policies in place during this period did not “follow form” to the Liberty policies. Instead, they contained their own terms and conditions. The policies in excess thereof “follow form” to the first-layer umbrella policy.
In their insuring agreement and conditions the Northbrook and London Market umbrella policies specify that coverage shall not apply unless and until the insured or the insured’s underlying insurer becomes obligated to pay the amount of the underlying limit or retained limit. These policies also require that the property damage take place during the policy period. The cost of remediating, abating, or cleaning up seeping, polluting, or contaminating substances is *96 not covered, unless caused by a sudden, unintended, and unexpected happening during the period of this insurance.
Northbrook first-layer umbrella policies in effect from October 1, 1979 to October 1, 1982, as well as the excess umbrella policies above them, include a pollution exclusion, which excludes coverage for property damage arising out of the discharge or release of pollutants, unless the discharge or release is both sudden and accidental.
The London Market policies at risk from 1982 to 1985, and the excess policies above them contain the “Industries, Seepage, Pollution and Contamination Clause No. 3.”
II. The Issues
The Second Amended Complaint alleges that the environmental contamination for which the UTC plaintiffs are responsible in connection with the underlying environmental claims either commenced prior to the time when the insurance policies at issue contained any pollution exclusion or were sudden and accidental within the meaning of any such exclusion or otherwise were outside of the scope of any pollution exclusion purportedly applicable to such contamination.
Although the statements of issues submitted by the parties are virtually endless, the substantial issues appear to be seven (7) in number, as follows:
1. Whether UTC has been subjected to a “suit”:
2. Whether coverage exists for damage to property owned by or in the care, custody and control of UTC;
3 Whether and for what year the sudden and accidental exception to the pollution exclusion bars coverage;
4. Whether the insurers have an obligation to defend and indemnify UTC for liability arising from preacquisition activities of after-acquired subsidiaries:
5. Whether policies in effect prior to UTC’s shipment of waste or involvement at a particular site affords coverage;
6. Whether the absolute pollution exclusion bars all coverage; and
7. Whether costs incurred by UTC to comply with environmental laws and regulations are “damages” within the meaning of the CGL policies.
The language of the policies provides the basis for resolving these issues.
The policies are contracts developed and negotiated among large and highly sophisticated entities and must be interpreted under the normal rules of contract interpretation. It is not the function of the court to interpret the language so as to maximize or minimize coverage irrespective of the policy language.
A. Suit.
1. Policy Language.
The language of the Insuring Agreements in the underlying Liberty policies obligates Liberty “to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of. . . injury to or destruction of property.” Under the terms of the policy, Liberty “shall (a) defend any suit against the insured alleging such injury or destruction seeking damages on account thereof...”
The insuring agreements of the London Market Insurers provide that “underwriters agree ... to indemnify the Assured for ultimate net loss which the assured may sustain by reason of the liability imposed upon the Assured by law, or assumed by the Assured under contract, for damage on account of: (a) Comprehensive General Personal Injury and Property Damage Liability...”
The Lexington Insurance Company provided insurance to UTC, “subject to the exclusions, conditions and other terms" of the underlying Liberty policy. Such conditions include the requirement that the insured be subj ect to a suit for damages on account of property damage to the third party.
2. Massachusetts Law.
Massachusetts courts have held that a formal lawsuit or governmental action equivalent to a lawsuit will trigger an insurer’s duty to defend its insured. Governmental action is a “suit” when the consequences of the action are “substantially equivalent to the commencement of a lawsuit.” Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 696 (1990). Courts have usually required a showing that the action is adversarial or coercive, “making sufficiently clear that the force of the State will be brought promptly to bear in a way that threatens the insured with probable and imminent financial consequences.” Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 741 (1st Cir. 1990). In Hazen Paper, the court found that the EPA PRP letter met the requirements of a suit. In the letter, EPA demanded (1) immediate commitment to complete implementation of all cleanup measures and (2) reimbursement for costs incurred by EPA and the Massachusetts Department of Environmental Quality Engineering (DEQE); now the Department of Environmental Protection (DEP). It threatened criminal penalties and fines if Hazen Paper did not comply with the demands. Hazen Paper, supra at 694. According to the court in Hazen Paper, upon receipt of the EPA PRP letter Hazen Paper was forced to defend itself immediately, just as if it had been served with a complaint. The company faced inescapable financial responsibility, because pollution damage liability was not based upon fault. The risk to Hazen Paper was substantial, as liability was joint and several, and it could only increase if Hazen Paper did not respond immediately. The court noted the risk to the targets of governmental *97 action from the likelihood that the action would “result in a dispositive, extrajudicial solution.” Id. at 696-97.
This “suit” triggered the insurer’s defense obligation because it constituted a suit for damages on account of property damage. The EPA letter alleged that there had been actual releases of hazardous substances. In contrast to the EPA PRP letter, a contemporaneous notice to Hazen Paper from the DEQE, which alleged only a threat of release of hazardous materials and which asserted a claim for removal, was not a suit for damages on account of property damage triggering the insurer’s defense obligation. Id. at 698.
By letter of UTC’s counsel to the court dated July 15, 1991, UTC has agreed that no “suit” or its equivalent within the meaning of Hazen Paper exists at the following sites: East Granby Landfill; Sikorsky Plant, Shelton; Sikorsky Plant, Bridgeport; Pratt & Whitney Plant, East Hartford; and, possibly Essex (McCallen) Plant, New Market.
B. Damages 1. Policy Language
In its CGL policies, Liberty agreed to pay on behalf of the insured, all sums which the insured became legally obligated to pay as damages because of injury to or destruction of property accidentally caused.
At the time this action was filed, the term damages had not been interpreted by the Massachusetts Supreme Judicial Court.
2. Massachusetts Law
In Hazen Paper Co. v. United States Fidelity and Guar. Co. 407 Mass. 689 (1990), the court held that cleanup costs of contamination to the environment constitute damages within the meaning of the policy.
The language in the Pollution Liability Coverage Endorsement appearing in the 1983-1985 Liberty policy specifically states that Liberty would reimburse the insured for reasonable and necessary cleanup costs.
Even where the policy does not specifically provide coverage for cleanup costs, courts in the majority of states have held that environmental cleanup costs, incurred in response to demands of governmental agencies, are damages where there has been a discharge of pollutant that has caused property damage. Hazen Paper, supra at 699. Massachusetts follows the majority, holding “[w]hen pollution has occurred, cleanup costs are damages within the policy language,” id. at 700, i.e., cleanup costs are damages because of property damage.
However, the Supreme Judicial Court in Hazen Paper distinguished response costs incurred for extant pollution, for which there was coverage, from costs incurred to prevent future pollution, for which there was not coverage. Hazen Paper, supra at 698, citing Aerojet-Gen. Corp. v. Superior Court, 211 Cal.App.3d 216, 237 (1989).[4] The court in Hazen Paper held that damages did not include (1) the costs of complying with an injunction or governmental agency order directed to damage prevention, or (2) the costs of complying with the law when there has been no property damage. Hazen Paper, supra at 698.
C. Preacquisition Coverage.
1. Policy Language.
UTC seeks coverage from Liberty and its excess liability insurers for environmental liabilities of its subsidiaries and divisions under policies in place prior to UTC’s acquisition of these companies. Liberty issued policies between October 1, 1960 and October 1, 1975, in which it agreed to provide coverage to:
United Aircraft Corporation (former name of UTC) [and various specifically named divisions or subsidiaries of UTC] and any and all domestic companies, domestic corporation[s] and other domestic business entities now or hereafter during the policy period owned, operated, controlled by or subsidiary to the aforementioned corporation or as interests appear, herein called the named assured.[5]
Section VI, the Policy Period section in the Liberty Policies, provides that the policy applies “only to . . . injury to or destruction of property during the policy period.”
The London Market excess insurance policies for the period 1965-1968 list only United Aircraft Corporation and/or United Aircraft International, Inc. as named insureds, and thus they extend coverage only to those entities. The London Market policies in effect from 1968 to 1970 describe the “Named Assured” as:
United Aircraft Corporation and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to Underwriters.
For London Market policies in effect from 1970-1975, there is no definition of “Named Assured.” The insuring clause provides:
Whereas UNITED AIRCRAFT CORPORATION and/or any wholly controlled or owned subsidiaries (hereafter called ‘the Assured’) have paid the premium ... We the Underwrites agree to pay on behalf of the assured all sums which the assured shall become liable to pay ... to any person ... as damage for . . . damage to property caused during the period of this policy ... as more particularly and fully described in the policies set forth in the schedule of the Underlying Insurance [the Liberty Mutual policies] . . .
2. Massachusetts law.
Under plaintiffs’ interpretation of the policies the insurers would be required to indemnify UTC, not only for its own liabilities incurred during the policy period, but for preacquisition damage caused by activities of entities acquired by UTC only after the expiration of the policies. According to this interpretation the insur *98 ers would be providing coverage to an entity which was not a named insured and which was a stranger to the policies and to UTC. The plain language of the policies precludes such an interpretation. In its pre-1974 policies with UTC, Liberty specifically limited coverage to those entities “now or hereafter during the policy period owned, operated or controlled by or subsidiary to UTC.”
UTC maintains that, because it may be held jointly and severally liable for alleged property damage, it is entitled to coverage under the Liberty policies in place when the damage occurred, even though UTC had no connection with the entity that caused the pollution damage at that time.
The argument that the insured is entitled to indemnification for damages on account of property damage, even if insured had no connection with the pollution entity when damage occurred, was considered and rejected in treatises and out-of-state cases. “Generally a policy will not be extended to cover liability of one who is not a party thereto and not contemplated with the risk.” 7A Appleman, Insurance Law and Practice §§4491.01 at 2 (Supp. 1992); Maryland Casualty Co. v. W.R. Grace & Co., 794 F.Supp. 1206, 1230-32 (S.D.N.Y. 1991) (under New York law, CGL policies provided no coverage for damages caused by asbestos manufacturers prior to their acquisition by insured); Upjohn Co. v. Aetna Casualty and Sur. Co., 768 F.Supp. 1186, 1204 (W.D.Mich. 1990) (under Michigan law, insurer had no duty to defend, where insured’s policy terminated prior to its acquisition of polluting entity); State of Idaho v. Bunker Hill Co. 647 F.Supp. 1064, 1077 (D.Idaho 1986) (insurer did not assume liabilities of constituent company prior to date of merger).
In the normal course of writing insurance, the underwriters assemble information about the risks from the agents, brokers and the insured and then decide whether they wish to insure the risk and if so at what premium. To extend coverage to preacquisition environmental problems would not be consistent with the underwriters’ role.
Even if UTC agreed to assume the past environmental obligations and liabilities of an acquired subsidiary, it does not follow that any such losses are covered by the policies in existence prior to the acquisition.
This court finds persuasive the reasoning of the court in Upjohn Co. v. Aetna Casualty and Sur. Co., No. 4:88-CV-124, slip op. at 4-6 (W.D. Mich. Sept. 9, 1991) (emphasis added):
Clearly, the language of the agreement limits liability to an accident that causes or results in property injury or destruction giving rise to Upjohn’s liability. The injury to or destruction of the property giving rise to Upjohn’s liability did not occur until after the General Accident policy had expired. There was no basis to hold Upjohn liable at the time of the property injury or destruction occurring during the years that General Accident’s policies were in effect. The fact that there occurred property damage during the time that General Accident’s policies with Upjohn were in effect does not automatically result in coverage under one of the policies because at the time of the accident or occurrence resulting in that damage, Upjohn had absolutely no connection to or involvement with the property. The General Accident policies with Upjohn do not cover Upjohn’s liability because Upjohn established the contacts or involvement with the property subsequent to the dates in which the policies were in effect. The fact that Upjohn may not [sic] be held liable for that property damage does not implicate the long-expired General Accident policies.
. .. The basis for Upjohn's liability under the law is its connection to or involvement with the contaminated property — that connection did not arise until after the policies had expired. Even though the harm arose during the years the policies were in effect, there was no basis, discovered or undiscovered, for Upjohn’s liability arising during those years. At the time of the contamination that occurred during the years that Upjohn was insured by General Accident, Upjohn had no legal or factual relationship, connection or involvement with the damaged property.
D. The Owned-Property Exclusion 1. Policy Language.
Each Liberty policy issued for the period October 1960 through October 1, 1985, contains an exception to the insuring agreement as follows: “This policy does not apply to injury to or destruction of property owned by any named insured.”
Endorsement 3, the Pollution Liability Coverage Endorsement applicable to gradual pollution, specifically excludes property damage or environmental damage to property owned or occupied by or rented to the insured or property in the care, custody or control of the insured.
2. Massachusetts Law.
The owned-property exclusion will not bar coverage of cleanup costs undertaken on plaintiffs property where there is actual or threatened damage to third party property, including groundwater beneath the insured’s property.
The defendant insurers contend that contamination of the groundwater is not property damage to the property of a third party and the CGL policies afford no coverage by virtue of the owned-property exclusion. The insurers cite for their position the dicta in Gamer v. Milton, 346 Mass. 617, 620 (1964), wherein the court stated: “It is, of course, settled in this Commonwealth that a landowner has absolute ownership in the subsurface percolating water in his land. He may use it as he sees fit, even if this results in a loss of water in his neighbor’s land."
*99 The court refers to the case of Greenleaf v. Francis, 18 Pick. 117 (1836), which held that a landowner had a right to dig a well on his own property for his water supply even though it diminished the abutter’s water supply.
Those decisions do not stand for the proposition that a landowner may contaminate or damage the quality of the groundwater. With current knowledge of the migration of groundwater and the ability to measure and determine the speed and direction of flow, it is not likely that the Massachusetts appellate courts would apply the owned-property exclusion to contaminated groundwater.[6]
Massachusetts has enacted a comprehensive statutory scheme to coordinate management and protection of all the water resources of the Commonwealth and the disposal of wastes, including hazardous materials. According to the statute governing the Executive Office of Environmental Affairs, G.L. 21 A, §8, DEP has all powers and duties which relate to water supply and water quality, including those of the water resources commission, and the division of water pollution control. It is clear from the statutory provisions that water resources include groundwater. The Massachusetts Oil and Hazardous Materials Release Prevention Act, G.L.c.. 2IE, §2, provides that “waters of the Commonwealth” are waters within the jurisdiction of the Commonwealth without limitation, rivers, streams, lakes, ponds, springs, impoundments, estuaries, coastal waters and groundwater. According to the Massachusetts Water Management Act, G.L.c.. 21G, §2, a “water source” is “any natural or artificial aquifer or body of surface water, including its watershed where ground and surface waters are interconnected in a single hydrological system.”
Where contamination of groundwater is limited to the property of the insured, there may be coverage for cleanup costs to prevent imminent harm or to mitigate harm to the property of another even in the absence of a third-party claim.
Case law in Massachusetts and other states supports the proposition that recovery of costs of cleanup to prevent imminent danger of contamination to third-party property or to prevent “costly damage to the property of others” is not barred by the owned-property exclusion. Allstate Ins. Co. v. Quinn Constr. Co., 713 F.Supp. 35, 41 (D.Mass. 1989), vacated on account of settlement, 784 F.Supp. 927 (D.Mass. 1990). Where groundwater is polluted, courts in other jurisdictions have refused to apply the owned-property exclusion. In a Michigan case the court held that pollution of groundwater was an injury to the public interest and that the owned-property exclusion was inapplicable. Polkow v. Citizens Ins. Co. of Am., 180 Mich.App. 651, 659 (1989). Other Michigan cases have held that when groundwater is polluted the owned-property exclusion does not apply, because groundwater is public property. United States Aviex Co. v. Travelers Ins. Co., 125 Mich.App. 579 (1983); Upjohn Co. v. New Hampshire Ins. Co., 178 Mich.App. 706, 719-20 (1989). A New Jersey court held that “under the parens patriae doctrine the State had a colorable claim for damage to the stream,” which was caused by release of gasoline from insured’s storage tanks, and that the neighboring landowner also had a claim for property damage. Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co. of N.Y., 218 N.J.Super. 516, 528 (App.Div. 1987).
However, to the extent that all or a portion of cleanup relates solely to damage to insured’s property and does not relate to prevention of off-site contamination, the owned-property exclusion clearly applies, and such damage is not within the coverage provided. Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 698 (1990); Shell Oil Co. v. Accident & Casualty Ins. Co., 278953 (Calif.Super.Ct., San Mateo Co., July 13, 1988) (costs incurred for measures taken on excluded property to mitigate damage to third-party property are covered, but cost to restore or clean up excluded property are not covered).
E. Absolute Pollution Exclusion.
1. Policy Language.
For the period October 1, 1985 to October 1, 1986, the Liberty policy was amended to include an absolute pollution exclusion. The exclusion provides as follows:
It is agreed that personal injury and property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, water, or the atmosphere are excluded.
Formerly, the standard pollution exclusion permitted coverage for damages resulting from the discharge, dispersal, release or escape of contaminants or pollutants when “sudden and accidental.” As a result of dissatisfaction with judicial construction given to the standard pollution exclusion and with the increased exposure from the enormous explosion of environmental litigation, insurers redrafted the pollution exclusion to eliminate the exception for “sudden and accidental” pollution. 7A Appleman, Insurance Law and Practice §4499.05 at 37, 45 (Supp. 1992); Vantage Development Corp., Inc. v. American Env’t Technologies Corp., 251 N.J.Super. 516 (Law Div. 1991). All “discharges or escapes of pollution” are to be excluded from coverage. Guilford Indus., Inc. v. Liberty Mut. Ins. Co., 688 F.Supp. 792, 795 (D.Me. 1988). The absolute pollution exclusion is considered to be clear, unambiguous, and enforceable. Id.; Appleman, supra at 37.
2. Massachusetts Law.
Although there are no Massachusetts appellate cases in point, this court is convinced that Massachusetts would adopt the plain meaning of the words contained in the absolute pollution exclusion and *100 preclude coverage after October 1, 1985 for property damage caused by pollution, whether gradual or sudden and accidental.
F. The Pollution Exclusion.
1. Policy Language
The Liberty policies agree, subject to certain exclusions, to provide coverage for liability due to property damage caused by an “occurrence.” The policies define “occurrence” as an “accident, including continuous or repeated exposure to conditions, which results during the policy period in bodily injury or property damage neither expected nor intended from the standpoint of the insured." After October 1, 1970, each policy also contained a pollution exclusion clause which stated that the insurance did not apply to injury to or destruction of property arising out of pollution or contamination due to ’’the discharge, dispersal, release, or escape of smoke, vapors, soot, heat fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water." Damages resulting from the discharge of pollutants were not covered, even if they constituted an occurrence. However, an internal exception in the exclusion reestablished coverage for damages resulting from sudden and accidental releases of pollutants. While damages from sudden and accidental releases of pollutants were covered in the main body of the CGL policies, specific endorsements provided coverage for damage from gradual pollution up to an agreed-upon limit.
There are therefore two grants of coverage in the Liberty policies that might apply to a claim for property damage caused by pollution.
Beginning in 1970, the policies contained an endorsement which by its own name, provided “Environmental Pollution and Disturbance Coverage” (Endorsement 4). Endorsement 4 provided broad coverage for environmental damage, but specifically provided that it not apply to discharges which are sudden and the resultant property damage was neither expected nor intended from the standpoint of the insured. If the property damage was caused by a sudden and accidental release of pollutants, coverage was available under the main body of the policy. As to any claim for pollution property damage, a determination must be made whether the claim should be considered under Endorsement 4 (gradual pollution) or the main body of the policy (sudden and accidental).
To the extent that they are covered at all, all of the claims in this action for damage occurring after 1970 are covered by Endorsement 4 for the reasons hereinafter set forth. As will be seen, no claim meets the sudden and accidental qualification within the meaning of Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 938 F.2d 1423 (1st Cir. 1991) (Belleville II).
UTC in its Statement of Legal and Interpretive Issues (p.7) characterizes the claims here involved as a “progressive process.” Such a progressive process is by definition gradual or non-sudden and results from the months or years of UTC’s waste handling and disposal practices.
The Liberty policy for the year ending October 1, 1971 offered for the first time environmental pollution and disturbance coverage (Endorsement 4) for environmental pollution occurring prior to and during the policy period. It did not cover property damage occurring after termination of the policy. The “prior to” language was deleted from subsequent policies. The amount of coverage available under Endorsement 4 was limited in amount and specified that repeated exposures to the same conditions constituted a single occurrence.
In summary, from October 1, 1970 until October 1, 1983, coverage for gradual releases was available up to a limited amount per occurrence under Endorsement 4. During the policy period from October 1, 1983 to October 1, 1984, coverage for gradual pollution was afforded on a claims-made basis under Endorsement 3. From 1970 until October 1, 1985, coverage was available within the main body of the policies for damage from sudden and accidental releases. The policy, for the period October 1, 1985 to October 1, 1986, was amended to exclude all pollution coverage.
Most excess liability carriers incorporate the Liberty provisions for this period or they exclude from coverage damage that was expected or intended from the point of view of the insured.
2. Sudden and Accidental Release.
If, as to any site, the pollution exclusion applies, the next issue is whether the internal exception to the pollution exclusion affords coverage because the release of the pollutant which caused the damage was “sudden and accidental.” The term “sudden” has a temporal aspect; only an abrupt discharge or release of pollutants falls within the exception. Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 680-81 (1990) (Belleville I).
“Because the ‘sudden and accidental’ exclusion is conjunctive, both conditions must be met for the exception to be operative.” Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 337 (1992); Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 692 (1990). Even if a release could be considered “sudden,” an insurer would not be liable for coverage unless the discharge was also “accidental.” Webster’s Dictionary defines “accidental” as “occurring unexpectedly or by chance, happening without intent or through carelessness.” Webster’s New Collegiate Dictionary 7 (1979). Black’s Law Dictionary defines accidental as “fortuitous, happening by chance or unexpectedly .. . not according to the usual course of things." Black’s Law Dictionary 15 (5th ed. 1979).
*101 “[WJithin the routine operations, . . . any single discharge may have occurred suddenly and accidentally .... [However, this fact] ‘cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a ‘sudden and accidental’ occurrence.’ ” Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass, at 338, citing A. Johnson & Co. v. Aetna Casualty & Sur. Co., 933 F.2d 66, 75 (1st Cir. 1991); Belleville II, supra at 1429 (coverage rejected where a company has for a lengthy period of time purposefully and regularly been carrying on operations involving continual pollution); Belleville I, supra at 681 n. 6 (a discharge that continues for an extended period . . . would likely cease to be accidental or sudden at some point).
The fifteen (15) New England sites encompass claims for both on-site and off-site contamination. The on-site claims allege contamination of the soil, surface and groundwater from UTC manufacturing operations and the storage and disposal of hazardous materials and waste on site. At some of these sites the contamination has migrated to the property of third parties or threatened to do so. The off-site contamination results from the disposal of hazardous materials at reclamation facilities, third-parly landfills or third-party disposal sites.
In reviewing the submissions pertinent to several dozen sites including the fifteen (15) New England sites, it becomes obvious that the off-site claims rarely if ever result from sudden and accidental occurrences within the meaning of Belleville II. Hence, pollution claims would not be considered under the main body of the Liberty policies which contain the sudden and accidental exception to the pollution exclusion.
However, assuming other policy conditions are met, gradual pollution coverage may be afforded under the Environmental Pollution and Disturbance Coverage Endorsement 4 in the amount of $100,000 in the earlier years and $250,000 in the later years.
The parties are at odds as to whether the pollution exclusion, appearing as endorsements in the periods October 1, 1975 to October 1, 1980 and October 1, 1984 to October 1, 1985 is applicable to operations and occurrences in the State of New Hampshire. The endorsement states: “This endorsement does not apply to operations or occurrences in ... New Hampshire.”
Liberty argues that the New Hampshire Insurance Commissioner acted outside of his authority in refusing to approve the pollution exclusion with the sudden and accidental exception proposed by the insurance industry. Subsequent court decisions support this position. However, the policies must be interpreted as written. The court is not free to revise or change their plain meaning. Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147 (1984).
There is nothing in the language of the policy that is dependent upon the acts, failure to act or decisions of the New Hampshire Commissioner of Insurance. The policy language is simple and unambiguous. The pollution exclusion endorsement does not apply to operations or occurrences in New Hampshire.
However, this ruling does not affect the coverage available in this action. The pollution exclusion, although it excluded gradual pollution damage, did provide for damage caused by a sudden and accidental event resulting in pollution damage. After deleting the pollution exclusion from the policy as it relates to New Hampshire occurrence, the policy is left with an operational Endorsement 4 which covers gradual pollution. As will be seen hereafter, UTC has failed to demonstrate that any property damage was caused by a sudden and accidental pollution event at any of the three New Hampshire sites.
Accordingly, the New Hampshire language has no effect on the coverage under the six relevant policies.
G. The Duty to Defend.
1. Policy Language.
Liberty, in its CGL policies agreed, subject to certain contingencies and exclusions, “to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of (a) personal injury; (b) injury to or destruction of property.” The policy also states that Liberty “shall defend any suit against the insured alleging such injury or destruction seeking damages on account thereof...”
While the primary insurer is responsible to indemnify and pay defense costs, the excess insurer is simply obligated to indemnify the insured for amounts recovered in excess of the primary insurer’s policy limits. The “Assistance and Cooperation Clause” in most of the policies provides that the excess insurers “shall not be called upon to assume charge of the settlement or defense of any claims made, suit brought or proceedings instituted against the insured ...” Some excess insurance policies provide that if the primary insurer’s aggregate policy limits are exhausted and the excess CGL policies become liable to indemnify the insured, then the excess insurer will contribute to the costs of defense in proportion to its share only if the excess insurer first has an obligation to indemnify the insured.
2. Massachusetts Law.
The insurer’s duty to defend is controlled by the insuring agreements in the liability policies. In Massachusetts:
[T]he initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the *102 policy terms, the insurer must undertake the defense.
Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 331-32 (1992), citing Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146-47 (1984), quoting Sterilite Corp. v. Continental Casualty Co., 17 Mass. App. Ct. 316, 318 (1983).
The court in Sterilite ruled that, in order to be free of a duty to defend its insured, the insurer must demonstrate with conclusive effect on the third party that as a matter of fact the third party cannot establish a claim within the insurance. Sterilite, supra at 323. In response to the apparently insuperable burden imposed by the Sterilite rule, the Massachusetts Supreme Judicial Court indicated that a declaratory judgement suit under G.L.c.. 231A would be the appropriate vehicle for resolving coverage disputes. Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 685 (1990). The court said in dicta that the insurer could avoid the duty to defend if it were apparent that the event which gave rise to the underlying claims is not covered by the policy. Id. at 686. Subsequently, the Supreme Judicial Court held that an insurer was not obliged to defend the insured where the complaint did not allege a sudden and accidental release. Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 335 (1992). The court in SCA Services said that the insurer may also demonstrate the absence of a duty to defend “byway of the insured’s answers to the underlying complaint... or a consent decree into which the insured has entered.” Id. at 338. This suggests that in the context of environmental liability insurance the insurer may free itself of the duty to defend if the insured fails to produce evidence of sudden and accidental releases in opposition to the insurer’s motion for summary judgment. Relying on SCA Services, a superior court case has held that the court may consider "the verified, detailed evidence obtained through extended discovery.” Polaroid Corp. v. Travelers Indem. Co., Civil No. 88- 5206 (Middlesex Super. Ct. April 1992). Another superior court case stated that “uncontroverted facts . . . may be considered by the insurer in determining whether it has an obligation to defend.” Rubenstein v. Liberty Mut. Ins. Co., Civil No. 90-1687 (Suffolk Super. Ct. October 9, 1991).
In the case at bar there is an absence of any allegation that the releases giving rise to the underlying claim were sudden and accidental. Paragraphs 92 through 542 of the Plaintiffs’ Second Amended Complaint allege releases that occurred in the course of plaintiffs’ continuing manufacturing and disposal operations. There is no hint that damage at any of the 122 sites was caused by sudden and accidental releases.
While the primary insurer is responsible to indemnify and pay defense costs, the excess insurer is simply obligated to indemnify the insured for amounts recovered in excess of the primary insurer’s policy limits. Comment, Excess Insurer’s Duty to Defend After Primary Insurer Settles Within Policy Limits, 70 Marquette L. Rev. 285, 293 (1987). “Because the duty of defense is contractual, insurance policies ought to be construed accurately and given the effect their language clearly commands . . . Furthermore, courts should give defense clauses ‘a literal interpretation consistent with their plain meaning.’ ” Id. at 311-12 (emphasis in original). The “Assistance and Cooperation Clause” in most of the policies provides that the excess insurers “shall not be called upon to assume charge of the settlement or defense of any claims made, suit brought or proceedings instituted against the insured ...” The excess policies’ language provides that the defense contribution obligation can arise only if the excess insurer first has an obligation to indemnify the insured. According to the plain language of the policy, the excess carrier has no obligation to defend or contribute to defense costs, unless the final loss figure exceeds the primary coverage limit.
The parties have informed the court by way of written submissions and oral representations that Liberty has investigated, defended and paid cleanup and remediation costs relative to some of the New England sites. The extent to which this was done is unknown to the court at this time and will be resolved at a future date. The court notes, however, that UTC’s submissions indicate that for several sites, the first notice of a claim and request for a defense was by way of the original Complaint filed in this action on December 24, 1987.
H. Trigger of Coverage and “Deemer” Clause. 1. Policy Language.
In general, the Liberty policies prior to October 1, 1985 afforded coverage for property damage caused by the discharge or release of pollutants or contaminants into the environment. Contamination of property resulting from unintended and unexpected or sudden and accidental releases was covered in the main body of the policy to the policy limits. Gradual pollution property damage was covered by endorsements to the policy in a limited amount as set forth in the specific endorsement.
The Liberty policies and endorsements grant coverage for property damage arising or occurring during the policy period. Policies which Liberty issued to UTC from 1958 to 1970 provided that the “policy applies only to . . . injury to or destruction of property which occurs during the policy period." These policies did not apply to property damage from “repeated exposure, any part of which occurs after termination of this policy.” The policies contained no specific reference to pollution.
In 1970, Liberty policies were changed from accident-based policies to occurrence-based policies. An “occurrence” is an “accident, including repeated expo *103 sure to conditions, which results, during the policy period, ... in property damage ...”
In 1970, coverage for damage from gradual pollution releases was excluded from the main body of Liberty policies, but was provided by EPDH coverage in Endorsement 4. For the first year, Endorsement 4 coverage applied to damage occurring prior to or dinr-ing the policy period, but it did not apply to damage occurring after termination of the policy. From 1971 until October 1, 1983, Endorsement 4 coverage was provided only for damage that occurred during the policy period.
From at least 1960 and continuing through 1985, the policies contained a “deemer” clause. This clause provided that “injury to or destruction of property . . . caused by exposure to conditions during a period of days, weeks, months or longer . .. shall be deemed to occur only on the last day of the last exposure to such conditions.”
2. Interpretation of Policy Language.
The plaintiffs contend that once a progressive environmental property damage occurs, all policies in effect for the commencement of the process through its termination are triggered. Plaintiffs argue that this interpretation is supported by (1) Massachusetts case law and rules of construction for disputed language of the insurance policy; (2) out-of-state authority; (3) decisions declaring that trigger of coverage language in the policies is ambiguous; (4) drafting history of the standard-form language on which Liberty’s trigger of coverage language is based; and (5) Liberty’s inability to apply a consistent trigger of coverage theory in cases arising under their policies.
Plaintiffs argue that the concept of triggering multiple policy periods when injury spans two or more policy periods ... is the predominant rule in latent progressive bodily injury cases, as well as in non-environmental property damage cases. Hollingsworth v. Hartford Ins. Group, Inc., Civil No. 87-1451 (Norfolk Super. Ct. April 1991); Massachusetts Insurers Insolvency Fund v. Eastern Refractories, Inc., Civil No. 89-4811 (Suffolk Super. Ct. July 1991).
Plaintiffs discuss two cases in which the courts applied continuous trigger to environmental pollution. In both cases it was impossible to date the injury.
In New Castle County v. Continental Casualty Co. (CNA), 725 F.Supp. 800, 812 (D.Del. 1989), the court ruled that “given the impossibility of determining the point in time any time specific definition of injury took place,” it would apply a continuous trigger, embracing the dumping, leaching from the landfill, and discovery of the pollution damage.
In a recent Superior Court decision, it was held that all the insurers had a duty to defend seller of property for cleanup costs, because buyer’s complaint, which alleged no date of occurrence, was ‘reasonably susceptible’ of an interpretation that the contamination from leaking oil tanks may have occurred during any one and perhaps all of the insurers’ respective polity periods. The time period extended from the installation of the tanks in 1940-1941 until discovery of the property damage in 1988.[7] Rubenstein v. Liberty Mut. Ins. Co., Civil No. 90-1687 at 9-10, 12 (Suffolk Super. Ct. October 1991).
Plaintiffs’ remaining arguments assume that most polity terms defining trigger of coverage are ambiguous. Plaintiffs claim that, because the courts and insurers have applied various trigger theories, the term is ambiguous, and therefore the theory most favorable to the insured must be adopted. Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 12 (1989); Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986) (policy should be interpreted to achieve its main purpose of protecting the insured).
Plaintiffs cite cases which have found the terms “injury” and “occurrence” to be ambiguous, but all refer to bodily injury leading to progressive disease. American Home Prods. Corp. v. Liberty Mut Ins. Co., 748 F.2d 760, 766 (2d Cir. 1984), affirming and modifying American Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F.Supp. 1484, 1497 (S.D.N.Y. 1983) (DES); Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982) (asbestos); Hollingsworth, supra (asbestos); Burroughs Wellcome Co. v. Commercial Union Ins. Co., 642 F.Supp. 1020 (S.D.N.Y. 1986) (DES).
The defendant insurers assert that the CGL policies which UTC purchased from Liberty afford two types of coverage for pollution damage to third-party property. The defendants assert (1) that property damage resulting from the gradual release of pollutants is covered under Endorsement 4; and (2) that coverage for such damage caused by a sudden and accidental release of pollutants is afforded in the main body of the policy. The defendants argue that the date when the property damage occurs is the date of manifestation or discovery of the damage.
The defendants contend that (1) the policy in force on the date the third-party property damage is discovered will be triggered in cases where property damage is caused by gradual release of pollutants and (2) where damage is caused by a sudden and accidental release, coverage is provided by the main body of the policy, and the trigger of coverage is controlled by Section VI of the policy, i.e., the “deemer” clause. They assert that the “deemer” clause applies only where the release is sudden and accidental and the exposure to pollutants continues “over a period of days, weeks, months, or longer.”
Where a sudden and accidental release results in continuing exposure and causes pollution damage, Liberty declares “the last day of the least exposure to conditions” is the date the site has been cleaned of contaminants.
*104 The purpose of the “deemer” clause, according to Liberty, is to limit the insurer’s risk to the coverage limit of one policy. The “deemer” clause deems the injury to have occurred on a single day. Liberty contends that the “deemer” clause is inconsistent with UTC’s claim that there is a continuous trigger of coverage throughout the period of exposure which triggers multiple policies.
Massachusetts courts have not selected a uniform trigger of coverage, ruling instead that “a crucial factor in determining when ‘property damage’ occurs for purposes of insurance coverage is the nature of the injury.” Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 685-87 (1990). A recent Missouri case applied an injury-in-fact theory to property damage from environmental contamination.
At any time a finder of fact determines that the effects of exposure to waste or hazardous materials released by [the defendant] actually resulted in damage to the off-site environment, if the Third-Party Defendant Insurers’ insurance policies were in effect at such time, then those insurers, and only those insurers’ duty to indemnify [the defendant] for the underlying claim ... is triggered.
United States v. Conservation Chem. Co., 653 F.Supp. 152, 197 (W.D.Mo. 1986). The court in Conservation Chemical suggested that an injury-in-fact might occur at the time of the first exposure and that it might occur before it became manifest. Id.[8]
Some Massachusetts courts have applied the injury-in-fact theory to determine coverage. In an earlier Massachusetts case the court held that the “time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.” Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 152 (1984), quoting Bartholomew v. Insurance Co. of N. Am., 502 F.Supp. 246, 252 (D. R.I. 1980), aff'd sub nom. Batholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir. 1981). A recent case in federal district court adopted the Gilbane definition of trigger of coverage.
Under “occurrence” coverage [as distinguished from “claims made” coverage], as commonly construed and applied in Massachusetts . . . and other states as well, an entity making a tort claim against the insured must sustain harm within the period of the policy in order to assert a claim to which the insurance applies.
Hoppy’s Oil Serv., Inc. v. Insurance Co. of N. Am., 783 F.Supp. 1505, 1508 (D.Mass. 1992).
In a recent Superior Court case the court rejected the insurers’ applications of the “manifestation” or “first discovery” rule derived from asbestos litigation in the First Circuit, to cases of environmental property damage. High Voltage Eng’g Corp. v. Liberty Mut. Ins. Co. (HVEC), Civil No. 90-0566 at 10 (Norfolk Super. Ct. January 1992), citing Eagle-Picher Indus., 682 F.2d 12 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983).
Because one may be exposed to asbestos without later contracting asbestosis, exposure does not provide a basis for ascertaining damages. Consequently, the manifestation trigger makes sense in asbestos cases. On the other hand, because the effects of environmental pollution are reasonably well known and susceptible to quantification, the injury-in-fact trigger is appropriate where environmental pollution results in property damage.
The trigger of coverage is a contract question, and in Massachusetts the meaning of contract language is a question of law.[9] Trigger rulings should be derived from the operative language of the policy, as opposed to the judicial gloss placed on similar language in analogous cases. Dow Chem. Co. v. Associated Indem Corp., 724 F.Supp. 474, 479 (E.D.Mich. 1989). In the HVEC case, the relevant “Liberty policies define property damage to include physical injury ‘occurring during the policy period.’ ” The court found that the plain meaning of this language would appear contrary to the definition of “occurrence” as manifestation, the definition applied to the asbestos cases. HVEC, supra at 11. At least two federal courts examining the language of the damage clause have made the same interpretation and holding. American Home Prods. Corp. v. Liberty Mut Ins. Co., 748 F.2d 760, 764 (2d Cir. 1984); Trizec Properties, Inc. v. Biltmore Constr. Co., 767 F.2d 810, 813 n.6 (11th Cir. 1985).
3. “Deemer” Clause.
At least since 1960, the Liberty policies contained the “deemer” clause referred to earlier. That clause was a part of the policies before there was an awareness of environmental pollution problems among the general public and governmental authorities. The first federal effort to regulate hazardous waste appeared in the Resources Conservation and Recovery Act of 1976. The cleanup of hazardous waste was not mandated prior to the Comprehensive Environmental Response, Compensation and Liability Act of 1980. We are now urged to interpret the “deemer” clause in different ways to arrive at a particular result.
Plaintiffs argue that in applying the “deemer" clause, Liberty has used various definitions for the terms “exposure,” “last exposure,” and “conditions”; therefore, they are ambiguous and must be interpreted in away that favors the insured. Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 12 (1989). Plaintiffs object to Liberty employing the “deemer” clause to clarify the ambiguous term “trigger of coverage.” The “deemer” clause, Section VI, states that injury to property caused by an extended exposure to conditions “shall be deemed to occur only on the last day of the last exposure to such conditions.” A long-time Liberty underwriter admitted that there has never been a policy on interpreting the “deemer” clause. Deposition ofTheresa Maloney, taken July 24, *105 1991, at 2-137, lines 12-21.[10] William Upton reported that, in order to avoid providing coverage for a known loss in situations where pollution damage is reported in one policy period but is not cleaned up until several policy periods later, Liberty staff ignored the “deemer” clause. In “USEPA-type claims,” underwriters assigned the date of claim, not date of last exposure, as the date of loss.
Plaintiffs have shown that Liberty has not applied the “deemer” clause or any other consistent standard in assigning the date of loss. As a date of loss, Liberty has designated the date of notice of a claim, of a USEPA PRP letter, the date of the USEPA request for information, the date the state filed suit, and the date that cleanup commenced. Appendix to Plaintiffs’ Memorandum Concerning the Trigger of Coverage Issue, Exs. 3, 5, 6, 8, 10, 21, 22, 23. Liberty has changed date of loss in order to make them fall within the policy to which Liberty has assigned the claim. Appendix, Ex. 4, 7. Liberty sometimes informed the insured, “[t]his is an arbitrary date of loss which may be adjusted in the future." Appendix, Ex. 13. Liberty has been equally arbitrary in assigning a different date of last exposure. Where surface cleanup was complete, but where more cleanup of subsurface was planned, Liberty assigned the date the surface cleanup commenced as the date of last exposure. Appendix, Ex. 16.
The defendants now take the position that the “deemer” clause only applies to property damage covered in the main body of the policy and applies only where the release is sudden and accidental and where the exposure to pollutants continues over a period of days, weeks, months, or longer. Memorandum of Liberty Mutual Ins. Co. on the Analytical Framework of the Policies Issued by Liberty Mutual to United Technologies and on the “Deemer” Clause, at 14.
Limiting the application of the “deemer” clause to the main body of the policy is consistent with the history of the clause and with the plain meaning of the policy language. The “deemer” clause was introduced into Liberty policies before any specific provisions were made for coverage of damage resulting from pollution. It was included at least since 1960 in the accident-based policies, and it remained through policy changes. It is reasonable to infer from the history of the clause that it formerly applied to damage caused by accident and that in the pollution context it now applies only to damage caused by sudden and accidental releases, which, since 1970, has been covered in the main body of the policies.
At the Old Southington Landfill, the site was capped and sold for development before it was discovered that the liquids from the landfill were leaching into the water supply of adjoining owners. The solution might be to provide a new water supply to the abutters. Application of the “deemer” clause to this situation would require the leaching to cease before any policy is triggered. At the landfill, the leaching may never cease and no policy would be triggered.
It would be difficult or impossible to apply the “deemer” clause consistently to gradual pollution damage. The pollution damage may never be cleaned up and there will be no last day of exposure. Governmental remediation orders do not in many cases require cleanup. The order may call for monitoring the source of the pollution or cleanup as much as is practical or capping a site with gravel or removing contaminated soil. Finally, the language of the “dee-mer” clause is inconsistent with its application to partial cleanup of gradual pollution. The “deemer” clause clearly states that cessation of exposure, not substantial cleanup, is the event that triggers the policy.
Accordingly, this court is of the opinion that the Massachusetts appellate courts would adopt the so-called injury-in-fact theoiy as best reflecting the intent of the policy language. Therefore, coverage for property damage caused by gradual pollution would be afforded by the policy or policies in force when the property damage occurred and that contamination resulting from a sudden and accidental happening would be covered by the policy in force when the remediation or cleanup, as far as feasible or to the extent mandated by federal or state environmental agencies, is completed.
III. Principles of Summary Judgment
Summary judgment shall be granted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, the party can demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). If the moving party demonstrates that there is no triable issue, the party opposing the motion must respond and allege specific facts which establish the existence of a material issue of fact in order to defeat the motion. Pederson, supra at 17.
In moving for partial summary judgment on fifteen (15) New England sites, the defendant has the burden of affirmatively demonstrating that there exists no genuine issue of material fact.on the issues raised in -the motion. The burden on the moving party may be *106 discharged by showing the absence of evidence to support the case of the non-moving party. A complete failure of proof concerning an essential element of the non-moving parties’ action renders all other facts immaterial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the defendants in this action have met their burden on the issue of coverage, the burden shifts to UTC to show with admissible evidence the existence of a dispute as to material facts.
IV. Memorandum of Decision as to Partial Summaiy Judgment on Fifteen (15)
New England Sites
The defendant insurers seek partial summaiy judgment based on the reasons set forth on the accompanying chart:
DAVIS LIQUID WASTE DISPOSAL SITE Smithfield, Rhode Island
The Davis family owned this land which has been described by the EPA as one of the most dangerous hazardous waste sites in America. See Complaint in United States v. Davis, No. 85-0616 (D.R.I.).
The insurers seek partial summary judgment on the basis of the pollution exclusion and the absolute pollution exclusion in the relevant CGL policies.
1.Site Operations. The plaintiffs’ pre-trial statements, allegations in the underlying complaint, and Environmental Protection Agency findings all establish that the cause of contamination and releases resulted from three primary operations: direct dumping of wastes delivered by tanker truck, emptying the contents of fifty-five gallon drums on the ground and storage of waste in drums above and below ground. In either 1975 or 1976, William Davis created two fifteen-foot deep unlined pits as a place to dump hazardous liquid and solid chemical wastes, so that he could salvage and sell the barrels in which the wastes had been shipped. Deposition of William Davis, taken December 14, 1983, at 5-7 and 45; Camp, Dresser & McKee, Draft Feasibility Study, Davis Liquid Waste Site Prepared for U.S. Environmental Protection Agency, Region I, April 1, 1987, at 1-9. Tanker trucks were driven up to the pits and their contents of waste materials dumped into the pits. Steel drums containing wastes were similarly disposed of in the pits. Davis Dep. at 42B-45. This dumping contaminated off-site private residential and monitoring wells. Record of Decision (ROD), dated September 29, 1987, at 9. Dumping of liquid wastes continued until a preliminary injunction was issued in 1977. A permanent injunction was issued in 1978. U.S. Environmental Protection Agency, Region I, Superfund Program Feasibility Study: Davis Liquid Waste Site, Smithfield, Rhode Island, May, 1987; Conservation Law Foundation v. Davis, Civil No. 77-2267 (Providence Super. Ct. September 20, 1977), at 7-10; Davis Dep. at 7.
Drums containing solid wastes were buried at the site. Davis. Dep. at 37; ROD at 4. The wastes, including resins, paints, solvents, leaked from deteriorating drums through the permeable sands of the site into the groundwater in the overburden and bedrock. Camp, Dresser, & McKee, Inc., Executive Summary
[[Image here]]
*107 and Introduction of Draft Remedial Investigation, Davis Liquid Waste Sites, Prepared for U.S. Environmental Protection Agency, Region I, November 1986, at 4-22.
Drums were also stored at various locations adjacent to the disposal pits. R.I. Department of Environmental Management, Field Investigation Report (DEM Rep.), dated July 25, 1979, and attached map of Davis site. By July 1985, the leaking barrels of hazardous waste found on the site “posed an imminent and substantial endangerment to public health and the environment.” ROD at 4. Between August 1985 and February 1986, approximately 600 intact and crushed drums were shipped from the site in an emergency removal action. ROD at 4.
Periodically semi-solid wastes from lagoons were excavated, dumped at other locations on the site and covered with soil. ROD at 3. In 1978, Davis excavated the contents and contaminated soil of the northern liquid disposal pit and spread it along a logging road which runs through the site. DEM Rep. and attached map; FIT Project Report, Preliminary Site Assessment and Emergency Action Plan for Davis Liquid Chemical Waste Disposal Site, Prepared for the U.S. Environmental Protection Agency, March 13, 1981 (FIT Rep.) at 2-4. Even after Davis stopped dumping liquid wastes, he continued to shred and dump automobile tires. By 1986, 30-35 million tires had been dumped on the site. United States v. Davis, supra, Complaint par. 16. The polluting discharges at the Davis Liquid Waste Disposal Site were not sudden or accidental. Davis’s purposeful and regular operation of the waste disposal site produced continual contamination over a long period.
2. Time Period of Damage. From about the year 1975, when Davis began accepting liquid wastes, through 1985, his dumping operation produced increasing contamination of his own and his neighbor’s properties. Pretrial Statement at 51.
3. Damage to Third-Party Property. By 1977, groundwater and the water of neighboring residential wells was contaminated with hazardous wastes. ROD at 9. By 1985, it “posed an imminent and substantial endangerment to public health and the environment.” ROD at 4.
4. No Sudden and Accidental Release. The EPA determinations concerning the material found at the Davis site make it clear that none of the releases were sudden and accidental. The plaintiffs have submitted nothing to dispute the fact that the landfill contamination was the result of continuous and repeated discharges, dispersals, and releases into the environment. More particularly, the plaintiff has not refuted the defendant’s evidence that there were no sudden and accidental releases at the site or shown that there is a triable issue of fact. In fact, the plaintiffs “concede that nothing we know of at the Davis Liquid Waste Landfill site would be considered ... to be a sudden or abrupt event.” Transcript of Hearing on Motions for Summary Judgment, June 22, 1992, at 40, lines 20-24.
5. Pollution Exclusion. All of the insured’s alleged activity at the site occurred while the policies contained the pollution exclusion or the absolute pollution exclusion. The plaintiffs argue that the court should consider Liberty’s representations and course of dealing in construing its policies. The plaintiffs also argue that the Liberty policies contained an exclusion different from the qualified ISO pollution exclusion and must be treated differently by the court. The court does not agree.
Faced with a showing that coverage is precluded by the pollution exclusion clause, the plaintiffs have the burden of producing countervailing materials showing that the pollution events fall within the internal exception to the pollution exclusion clause, because they are sudden and accidental. The plaintiffs have not met that burden.
6. UTC’s Involvement at Site. Counsel for UTC questions whether any hazardous waste was delivered to the Davis site at any time by UTC. That issue is about to be resolved in the Federal District Court in Rhode Island in the case of United States v. Davis, Civil No. 90-0484. UTC is a named defendant in that action.
In an interrogatory posed by UTC concerning the allegation in paragraph 30 of the Complaint concerning the basis of the action against UTC, the United States answered as follows:
United Technologies Corporation during 1976-77 sent waste, including drums of liquid wastes, semi-solids, and solids, or mixtures of liquids and solids to the Site by arranging, directly or indirectly with, among others, Acme Cesspool, Inc. and/or Erving “Jimmy” Blinkhorn, who in turn arranged with Robert Cece and Michael Macera and/or corporations owned or operated by Mr. Cece and/or Mr. Macera for disposal of such wastes, including such drums, at the Site. Such wastes were from some or all of United Technologies Corporation’s Pratt & Whitney Division facilities in Connecticut, which include jet engine manufacturing and metal finishing operations. Some or all of such wastes are believed to have included coagulated wax and liquid cleaners or solvents. Such waxes, cleaners and/or solvents are believed to have contained, among other components trichloroethylene, cadmium, methylene chloride, nickel, tetrachloroethylene, toluene, 1,1,1-trichloromethane, xylene, and zinc, listed hazardous substance under 40 C.F.R. §302. 4. These substances were found in soil and/or water samples taken from the site. Appendix, Vol. 111.1. Tab I-II Defendants’ Motion and Memorandum in Support'of. . . Summary Judgment.
Since no affidavits or other materials have been submitted to this court by UTC, partial summary *108 judgment on the insurance issues is appropriate. If UTC did not dump its waste at the Davis site, the issue of indemnity is moot but the issue of a right to defend remains. If UTC were a generator of hazardous waste deposited at the site, the pollution exclusion provisions of the policy bar coverage.
7. Conclusion. Because the releases of contaminants cannot be deemed to have been sudden and accidental and because any waste shipments by UTC had to have occurred during the period between 1975 and 1985, the pollution exclusion will preclude coverage under the main body of the policies. Coverage for damage which continued after the inception of the Absolute Pollution Exclusion on October 1, 1985 would be precluded by that exclusion.
In the event that Pratt & Whitney’s hazardous waste was deposited at the Davis site, any third-party claim would be considered under Endorsement 4 if all other terms and conditions of the policies were met.
Partial summary judgment in favor of the defendant is appropriate on the issue of the sudden and accidental pollution exclusion and the absolute pollution exclusion.
EAST GRANBY LANDFILL East Granby, Connecticut
This 29.40-acre site was owned and operated by the Town of East Granby as a landfill from November 1969 to January 1, 1989.
1. Site Operations. The Hamilton Standard Division of UTC at Windsor Locks (HSD) disposed of rubbish at the East Granby Landfill for two years in the early 1970s. The exact date of HSD’s disposal is uncertain. An inspector for the Connecticut Department of Environmental Protection (CTDEP) reported that the landfill was receiving industrial wastes from October 1, 1970 to February 26, 1971 and again beginning in August 1974. The inspector reported that on December 15, 1974, receipt of waste oil and sludge from HSD was recorded. This was the only precise date of HSD’s waste disposal at the landfill.
2. Damage to Third-Party Property. In 1974, Connecticut DEP inspectors observed waste migrating into the Muddy Brook. Closure plans were ordered in 1977 or 1978. In the 1980s, volatile hydrocarbons from the landfill had entered the soil and groundwater and had contaminated drinking water downgradient of the landfill. The plaintiffs say that damage commenced in 1969 and continued until 1985. Plaintiffs’ Pretrial Statement (Pretrial Statement) at 54.
3. No Suit. No action which would constitute a suit under the standard of Hazen Paper Co. had been filed. Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689 (1990). An administration action is a suit when the consequences of the action are “substantially equivalent to the commencement of a lawsuit.” Id. at 696 (1990). According to the court in Hazen Paper, the EPA letter demanding that Hazen Paper remedy contamination for which it was potentially responsible, constituted a suit, for “damages on account of property damage” because EPA notified the company (1) that there had been actual releases of hazardous substances, (2) that EPA had spent public money in response, and (3) that EPA would take further action unless Hazen Paper cleaned up contamination and reimbursed EPA. Id. at 693-95.
On October 21, 1985, Marshall Berger, Counsel for the Town of East Granby, wrote a letter to the Hamilton Standard Division. Attorney Berger informed HSD that local homeowners had filed suit against the town. He outlined HSD’s trash disposal at the landfill, and he warned HSD that in his opinion HSD might be liable. Transcript at 47, lines 19-24 to 48 lines 103. In a letter dated October 30, 1985, UTC answered Attorney Berger and requested further information. However, as of June 22, 1992, UTC had received no response. Transcript at 78, lines 4-8. During the intervening six and one-half years, the town and the homeowners settled the underlying lawsuit.
In addition, no state or federal environmental agency had contacted HSD. At his deposition, Paul A. LaQuerre, Sr. admitted that HSD had received no abatement order from either the Connecticut DEP or the USEPA. Deposition of Paul A. LaQuerre, Sr., taken July 18, 1991 at 118, lines 16-24 and 119, lines 1-5. He also stated that HSD had not been named a potentially responsible party in any lawsuit. Dep. of LaQuerre at 119, lines 6-10. HSD has not incurred any costs related to its disposal of trash at East Granby Landfill. LaQuerre then stated that HSD had made no estimate of its future costs at East Granby Landfill. Dep. of LaQuerre at 118, lines 12-15 and 136, lines 7-21. Finally, UTC claims that this action was premature because it admitted there was no suit pending concerning the East Granby site.
4. Pollution Exclusion. No claim has been made nor has evidence been presented by any party to indicate that UTC used the landfill prior to commencement of the CGL policy effective on October 1, 1970 containing the pollution exclusion.
Coverage for occurrences after October 1, 1970 would be barred by the Pollution Exclusion and after October 1, 1985 by the Absolute Pollution Exclusion. Liberty assigned the claim to their policy which ran from October 1, 1985 to October 1, 1986. During that period the Liberty policies contained the Absolute Pollution Exclusion.
5. No Sudden and Accidental Releases. In the face of evidence that the East Granby Landfill operation accepted waste and hazardous substances over a long period, the plaintiff has failed to submit any facts indicating that any sudden and accidental event occurred. The statement in the affidavit of the plaintiffs employee, Paul LaQuerre, that HSD sent the waste in good faith is irrelevant and inadmissible because it is not based on personal knowledge.
*109 At the hearing on the defendant’s motion for summary judgment plaintiffs counsel stated, “let me say that the plaintiff knew of no factual events which would qualify as sudden and accidental under the SCA Services standard.”[11]
6. Conclusion. The plaintiffs have admitted that no polluting event was sudden and accidental. UTC has not shown that it has been subjected to any action which would constitute a “suit” under the standard articulated by the Supreme Judicial Court in Hazen Paper, nor has it shown that it has had to pay “damage on account of property damage.” These facts alone make it impossible for UTC to survive summary judgment on the issue of Liberty’s duty to defend defendant and indemnify UTC for contamination of third-party property resulting from wastes it dumped at the East Granby Landfill.
Accordingly, it is appropriate that summary judgment be granted in favor of the defendant on all issues.
ESSEX McCALLEN PLANT Newmarket, New Hampshire
From 1950 to 1987, the McCallen plant produced resin-coated mica and other types of insulation. In 1968, Essex International, Inc. (Essex) purchased the McCallen Plant and Sufflex, located across the Lamprey River from the McCallen plant. From 1974 until 1988, Essex was a wholly owned subsidiary of UTC.
1. Site Operations. Solvents were used at McCallen in the manufacture of mica insulation. They were stored in four 7000-gallon underground tanks. A 30,000-gallon oil tank was located at this plant. Transcript at 54, lines 11-15.
Desiring to sell some of its buildings at this site, UTC engaged the services of Goldberg & Zoino Associates (GZA), an environmental consulting firm, to conduct an environmental survey. A 1987 analysis of the site by GZA identified Volatile Organic Compounds (VOCs) in a soil and groundwater report. Report of Goldberg & Zoino Associates, March 1988 Executive Summary (GZA Executive Summary), at 3. GZA estimated that the contamination from these hazardous chemicals extended to the eastern and southern limits of the property. VOCs were found in the groundwater in the western portion of the site. Polynuclear Aromatic Hydrocarbons (PAH’s) were found in the sediments of the Lamprey River adjacent to the McCallen site. The contamination of river sediments extended as far as the low tide line. GZA Executive Summary at 3.
2. Time Period of Damage. For over 100 years pollution-prone manufacturing has been carried on at the McCallen site. The McCallen plant manufactured mica products at the site for 37 years, but the plant was owned by a UTC subsidiary only from 1974 until operations ceased in 1987.
3. No Sudden and Accidental Release. UTC has attempted to show that contamination was the result of sudden and accidental releases. However, the specific examples given were not sudden and accidental as a matter of law. A leak of Bunker C oil from a corroded portion of an underground storage tank had been going on “for months or years” before it was discovered in 1971. Deposition of Leo P. Filion, taken October 6, 1991, at 126, lines 7-10 and at 126, lines 15-18. Spills of solvents and oils occurred in the course of regular deliveries to the plant. Deposition of Ernest Hamil, taken October 11, 1991, at 180, lines 22-25. Sediment contamination included products of coal burning and coal gasification which took place long before McCallen began its operations. GZA Executive Summary at 4.
The plaintiffs’ own experts admit that it is highly unlikely that they could prove at trial that the contamination was sudden and accidental within the meaning of SCA Services and Belleville JT.[12] “The history of the Essex site is long and complex with few records kept regarding the handling or possible releases of hazardous materials. Consequently, accurate spatial and temporal delineation of potential contaminant sources is difficult, if not impossible.” Hydrologic Study West Study Area and Lamprey River Sediments, Essex Site, Newmarket New Hampshire, prepared by Goldberg & Zoino Associates, Inc., February 1990, at 16.
4. No Pre-acquisition Coverage. Essexwas acquired by UTC by merger on November 26, 1973, and became a wholly owned subsidiary thereafter. Essex claims that, before the merger, it was entitled to coverage under both the Liberty and London Market policies. However, the Liberty policies in effect prior to the merger did not extend coverage to UTC subsidiaries.
In addition, the London Market excess policies did not name Essex as an insured. The policies, which were in effect from 1968 to 1970, describe the insured as
United Aircraft Corporation and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to the underwriter.
UTC argues that the words “or hereafter constituted” extend coverage to all UTC subsidiaries regardless of when acquired. The logic of this position escapes me. Therefore, prior to the acquisition by UTC, Essex was not a named insured and was, thus, not entitled to coverage under either policy.
5. Pollution Exclusion. The policies in place after UTC acquired Essex contain either the pollution exclusion or the absolute pollution exclusion. However, the policies for the period October 1, 1975 to October 1, 1980 and October 1, 1979 to October 1,1985 stated the pollution exclusion endorsement did not apply to operations in New Hampshire.
Absent the pollution exclusion in the policy concerning New Hampshire operations, the main body of *110 the policy as modified by Endorsement 4 would govern and afford coverage for gradual pollution damage if a suit had been filed relating to this site.
6. No Suit. The New Hampshire Department of Environmental Services (NHDES) has taken some administrative actions in cooperation with Essex which do not constitute a suit under the Hazen Paper standard. The plaintiffs admit that Essex voluntarily reported to NHDES the results of its study of contamination of soil and groundwater beneath the McCallen plant and its proposed work plan. NHDES opened a formal docket on the McCallen site. The plaintiffs admit that, while NHDES might take future adversarial action if Essex does not perform the suggested work, NHDES administrative actions in November 1987 were not adversarial actions. Supplemental Opposition at 14.
The most recent communication of NHDES to Essex stated, “No remedial action will be required to prevent groundwater contaminants from migrating into the Lamprey River.”[13] Letter of Walter C. Carlson, Senior Hydrologist, Groundwater Protection Section, Groundwater Protection Bureau to Richard Moessner, Essex Inc. (Carlson Letter), dated June 21, 991 at 1. NHDES did require that Essex establish a program to remove all free products from the monitoring wells and that Essex obtain a groundwater permit setting forth the locus and parameters of monitoring of groundwater. Carlson Letter at 2.
None of these administrative actions allege that the contamination of the McCallen site has damaged third-party property or natural resources or that NHDES has expended public funds to respond to the contamination. Therefore, none of the NHDES actions is a suit.
7. Conclusion. The defendants have moved for summary judgment on the McCallen site, claiming that (1) the pollution exclusion applies in New Hampshire and precludes coverage, (2) there is no suit, and (3) none of the pre-acquisition policies include Essex as a named insured. Submissions and depositions demonstrate that there is no genuine issue of material fact to contest that the releases at the McCallen plant were not sudden and accidental. The GZA report places the site squarely within the Belleville II doctrine.
No suit has been filed against Essex or UTC in relation to the alleged pollution at the McCallen plant. No third-party suit has been filed, and no PRP letter has been issued by any state or federal agency. The most recent NHDES letter, dated June 1991, advised UTC that no remedial action would be required to prevent groundwater contamination from migrating into the Lamprey River. Because there is no suit, the defendants' motion for summary judgment on the issue of UTC’s claim for defense and indemnity is appropriate.
HAMILTON STANDARD PLANT Windsor Locks, Connecticut
1. Site Operations. Hamilton Standard designs and manufactures aircraft, spacecraft, control systems, propulsion systems, propeller assemblies and testing equipment. From the 1950s until 1985, as part of its manufacturing operations, Hamilton Standard stored chemical wastes at its plant site. The chemical storage and disposal operation at Windsor Locks was pollution prone with extensive contamination of the soil and groundwater from leaking drums, underground storage tanks, pipes, on-site landfills, buried drums of waste, and unlined lagoons filled with metal sludge from the waste water treatment plant.
2. Time Period of Damage. On-site contamination from chromium and VOCs occurred from the 1950s to 1985. Off-site contamination was documented in 1980.
3. No Sudden and Accidental Releases. In 1965 and again in 1969-1970, there were discrete, identifiable releases of chromic acid from a tank into the surrounding soil. However chromium contamination exists all over the site. Between 1975 and 1982, in the course of Hamilton Standard’s ongoing program to manage storage drums of chemicals and chemical wastes, there were spills of chromic acid and of VOCs from these drums. In the early and mid-1960s VOCs stored on the unpaved J Lot were released. There may have been identifiable releases or chemical wastes at the sité. However, they took place from 1953 onward in the context of Hamilton Standard’s purposeful and regular operation of its on-site and waste storage and disposal program. According to Massachusetts law, such releases are not sudden and accidental. Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 338 (1992), citing A. Johnson & Co. v. Aetna Casualty & Sur. Co., 933 F.2d 66, 75 (1st Cir. 1991) and Lumbermens Mut. Ins. Co. v. Belleville Indus., 938 F.2d 1423, 1429 (1991). Moreover, the plaintiffs have not alleged in any submission that there has been a sudden and accidental release that led to contamination of third-party property.[14]
4. Pollution Exclusion. Because the plaintiffs have not alleged in any submission that there has been a sudden and accidental release that led to contamination of third-party property, the pollution exclusion will preclude coverage. The only off-site property damage was documented in 1980. At that time, the policies contained the pollution exclusion. The parties disagree about whether off-site pollution existed at the time of the incorporation of the absolute pollution exclusion which would bar coverage for damage occurring between October 1, 1985 and October 1, 1986.
5. Damage to Third-Party Property. The parties also disagree about whether there is identifiable damage to third-party property. According to the plaintiffs, by the 1980s, the chromic acid from the tank had leaked into the soil and groundwater, had formed a plume, and *111 had migrated downgradient toward the south property line of the plant site and beyond. Also, VOCs had seeped into the groundwater and were migrating beyond the south property line. The plaintiffs claim that there is off-site contamination of residential wells. The defendants contend that off-site contamination was detected in 1980, but that at present the existence of off-site contamination is uncertain. In the CTDEP Consent Order of August 13, 1986, Hamilton Standard agreed to monitor the level of trichlorethylene and/or chromium in four off-site wells. The order did not establish that contamination of the wells existed or exceeded Connecticut’s current levels for drinking water.[15] According to the defendants, the study of groundwater contamination by Deams and Moore concluded that, since groundwater contamination existed, off-site contamination was likely.
6. The Owned Property Exclusion. The policy excludes coverage for damage to property owned by the insured.
7. No Suit. The orders of the CTDEP, dated November 4, 1980, May 17, 1984, May 31, 1984, and the Consent Order dated August 8, 1986, do not constitute suits for damages on account of property damage. Damages on account of property damage do not include costs incurred in complying with an injunction or order directed to damage prevention or costs incurred in complying with the law, where there has been no property damage. Hazen Paper, supra at 698, citing Aerojet-Gen. Corp. v. Superior Court, 211 Cal.App.3d 216, 237 (1989) (response costs for extant pollution, but not for future pollution are “damages”). The CTDEP orders which date to August 13, 1986, allege violations of regulations that “may reasonably be expected to create a source of pollution for the waters of the state” and that water in four wells may become so contaminated as to require substitute sources of drinking water. The orders require Hamilton Standard to investigate and monitor the extent of pollution and to apply for necessary permits. Order No. 2925 requires Hamilton Standard to “provide treatment and/or removal of contaminated groundwater and soil to eliminate or minimize juture groundwater contamination” (emphasis added).
The RCRA Consent Order, No. 1-88-1075, dated August 7, 1989, between Hamilton Standard and USEPA is not a suit for damages on account of property damage. Since 1980, the EPAhas regulated Hamilton Standard’s activities involving hazardous waste pursuant to RCRA. According to the terms of the Consent Order, UTC agreed to perform an RCRA facilities investigation, to develop Media Protection Standards, and to draft a Correction Measure Proposal for its hazardous waste facilities at Windsor Locks. The Consent Order specifically stated that “this order does not require implementation of corrective measures, except such measures as are necessary to remedy threats to human health or the environment.” In the absence of property damage, “damages on account of property damage” do not include costs incurred in complying with the law. Hazen Paper, supra at 698. The costs associated with the RCRA Consent Order requiring Hamilton Standard to investigate its management of hazardous waste disposal facilities are costs incurred in complying with the law, and they do not constitute a “suit.”
8.Conclusion. There being no suit, summary judgment in favor of the defendants is appropriate.
KEEFE ENVIRONMENTAL SITE Epping, New Hampshire
This site, in southern New Hampshire, was owned by Keefe Environmental Services, Inc. from 1977 to 1981 and was in the business of receiving, storing and reclaiming hazardous waste. Industrial clients sent waste to this site in bulk tanker trucks or in fifty-five gallon drums.
1. Site Operations. By its nature, Keefe’s storage and preparation of hazardous chemicals for reclamation or disposal was a pollution-prone business. Included among Keefe’s industrial clients was the McCallen Plant of UTC’s Essex Group subdivision. Complaint, par. 24. Between 1978 and 1981, Essex sent wastes from its operations at the McCallen plant to the Keefe site. The McCallen wastes included resins, oils, methyl ethyl ketone, solvents, and paints. All operations at the Keefe site ended in 1981.
By the time Keefe ceased operations at the site in January 1981, 6000 deteriorating drums and a number of bulk storage tanks were on the site. The site also contained an open pit with a capacity of one million gallons. In 1981, the pit was 75% full. Keefe’s records indicate that the wastes in the pit included solvents, caustics, acids, sludges and laboratory packs. Complaint, par. 133. Contaminants in the groundwater included VOCs, priority pollutant metals, inorganic compounds and phenols. Complaint, par. 134 and Letter of Gregory H. Smith, Attorney General of New Hampshire, dated June 3, 1981, par. 1. Keefe’s purposeful and regular conduct of this business caused the contamination of groundwater in and around the site. Transcript of Hearing on Motions for Summary Judgment, June 22, 1992, at 88, lines 18-24 and at 89, line 1. The contributions of the Essex McCallen Plant to this contamination were by-products of the regular conduct of its business of manufacturing resin-coated mica insulation.
2. Time Period of Damage. From 1978 to 1981, UTC’s Essex McCallen Plant contributed hazardous waste to the Keefe site.
3. No Sudden and Accidental Release. At the hearing, counsel for the plaintiffs admitted, “The plaintiffs will submit to the Court that we are aware of no facts which would indicate that the releases at this particular facility were sudden and abrupt within the mean- *112 mg of SCA and Belleville J.”[16] Transcript at 90, lines 15-19.
4. Pollution Exclusion. The defendants correctly maintain that none of the policies in place prior to the shipments by Essex of wastes to Keefe is required to respond to the damage at the site. UTC’s policies with Liberty contained a Pollution Exclusion during the entire time the Keefe site was operating and during the years 1978 and 1981 when UTC's Essex McCallen plant sent waste. However, the Liberty policy for the period October 1, 1975 to October 1, 1980, and October 1,1984 to October 1,1985, expressly provides that the Pollution Exclusion shall not apply in New Hampshire. Because it is a contractual provision, the clause stating that the Pollution Exclusion is inapplicable in New Hampshire is unaffected by subsequent decisions of the New Hampshire Insurance Commissioner. The Pollution Exclusion will not preclude coverage for gradual damage at the Keefe site which occurred during that Policy period.[17]
5. Suit. In January 1980, the State of New Hampshire brought suit against Keefe, and the court entered orders regarding improved management of the site, reduction of hazardous material on the site, and abatement of hazardous conditions. In 1981, Keefe filed a bankruptcy petition.
There have been suits against UTC for damages on account of property damage caused by releases from the Keefe site. On June 3, 1981, the New Hampshire Attorney General advised Essex that it was a potentially responsible party. The letter recounted the presence in the Keefe site of 6000 deteriorating drums of waste and a lagoon containing 300,000 gallons of waste. The USEPA designated Essex a potentially responsible party in its letter of August 24, 1982.
According to the standards set forth in Hazen Paper, the New Hampshire Attorney General’s 1981 letter constitutes a suit. The letter informed UTC that as a transporter of wastes to the Keefe site it was by law a potential responsible party and asserted that there had been actual releases.
Furthermore, there is no doubt that the Federal Complaint filed on January 16, 1986, was a suit for damages on account of property damage. According to the 1986 Complaint, EPA undertook a response action at the Keefe site from February 1981 to September 1982 and expended public funds. Complaint, pars. 135-138. The complaint alleged that the defendants, including UTC’s Essex International, are jointly and severally liable for the damage constituted the commencement of an action. As a result, the parties entered into a consent decree on October 25, 1985. UTC was named twentieth out of 112 potentially responsible parties. Under the terms of the decree, UTC paid $32,000.
6. Conclusion. The wastes generated by the Essex McCallen plant and sent to the Keefe site between 1978 and 1981 caused some of the damage at that site. The actions of the New Hampshire Attorney General and the USEPA are “suits for damages on account of property damage” within , the meaning of Hazen Paper. The plaintiffs admit that none of the damage is the result of a sudden and accidental release.
Although the Pollution Exclusion was not operative in New Hampshire for the period October 1, 1975 to October 1, 1980 and October 1, 1984 to October 1, 1985, coverage for gradual pollution would be provided under Endorsement 4 if all other terms and conditions of the policy were met.
Accordingly, summary judgment in favor of the defendants is inappropriate based on the Pollution Exclusion.
NEWMARKET LANDFILL Newmarket, New Hampshire
This landfill site occupies 15 acres of a 129-acre parcel and has been used as a municipal industrial waste site since 1951. Waste was burned at the site until the mid 1970s. Thereafter, solid waste was accepted until 1991.
1. Site Operations. From 1952 to 1976, the Mc-Callen plant, owned by Essex, sent fifty-five-gallon drums of chemical wastes to the Newmarket Landfill on a daily basis. These chemical wastes were by-products of its manufacture of resin-coated mica products. Transcript at 106, lines 10-15; Affidavit of Gordon Ayers, dated December 23, 1987, pars. 6-14; SIRAS Agreement Between Essex and the Town of Newmar-ket, dated December 1988, at 2-4. Essex International, Inc. purchased the McCallen plant in 1968.
The consignment of chemical wastes, which included methyl ethyl ketone, xylene, toluene and acetone, was transported each day to the Newmarket Landfill. Ayers Aff., par. 20; Affidavit of Michael Vlodica, dated February 22, 1987, par. 14; Deposition ofTab Prewett, taken October 11, 1991, at 59, line 2. Plant employees emptied the contents of the drums on various parts of the landfill, and burned the chemicals each day.
2. Time Period of Damage. From 1951 to 1976 the McCallen plant delivered solvent to the Newmarket Landfill on a daily basis. Although it ceased burning solvents at the landfill in 1976, the McCallen plant continued to send mica wastes to the landfill until it was closed.
3. Properly Damage. In 1985, following orders from the State of New Hampshire to close the landfill, studies of soil and groundwater were undertaken. Contamination was found in Area M2 where McCallen plant employees dumped and burned chemical wastes. The Newmarket Landfill is situated on a surface water and groundwater divide between two wetlands. Baseline Risk Assessment at the Newmarket Landfill, Mica Pile, Final Report, Tech Memo 08, Prepared by E.C. Jordon Co., dated December 1989, (Baseline Assessment) at 1.1. In 1988, downgradient *113 groundwater in the bedrock and in the till was found to be contaminated with aromatic hydrocarbons, vinyl chloride, methyl ethyl ketone and arsenic. Methyl' ethyl ketone was a by-product of the manufacturing of tape at the Essex McCallen Plant. Ayers Aff., par. 20.
4. No Sudden and Accidental Release. “There is no doubt that the contamination in the groundwater at the [Newmarket] landfill was the result of regular, intentional, continuous disposal of waste into the landfill by its users, including Essex.” Transcript of Hearing on Motions for Summary Judgment, June 22, 1992, at 106, lines 16-20. The plaintiffs admit that they are “aware of no facts which would indicate that the releases were sudden and abrupt, consistent with the SCA decision.”[18] Transcript at 107, lines 19-21.
5. No Pre-acquisition Coverage. UTC’s liability policies provide coverage only for those entities owned, controlled by or subsidiary to UTC during the policy period. Essex was a wholly owned subsidiary of UTC from 1974 to 1988. During the entire period that Essex was a UTC subsidiary, UTC policies included either a Pollution Exclusion or an Absolute Pollution Exclusion, which barred coverage under the main body of the policy for damage from gradual pollution.
6. No Suit. In February 1988, the Town of Newmar-ket sent a letter to Essex stating that Essex was a potentially responsible party for contamination from the Newmarket Landfill. In November 1988, Essex voluntarily agreed to cooperate in investigation of the M2 area of contamination (the SIRAS Agreement), and studies have continued.
7. Conclusion. There is property damage to groundwater downgradient from the site at which Essex dumped and burned chemical wastes. The defendants have moved for summary judgment on the basis of the pollution exclusion. The plaintiffs admit that the contamination from the wastes which the McCallen plant dumped at the Newmarket Landfill did not result from sudden and accidental releases. UTC policies in place after 1974, while Essex was a wholly owned subsidiary of UTC, contained both Endorsement 4 and the Pollution Exclusion provision.
Because of no sudden and accidental event and the New Hampshire clause, there would be no coverage under the main body of the policy. However, Endorsement 4 may provide coverage if all of the other terms and conditions of the party are met.
Accordingly, summary judgment in favor of the defendants is inappropriate based on the Pollution Exclusion.
OLD SOUTHINGTON LANDFILL Southington, Connecticut
This municipal landfill site was used from 1920 to 1967 for the disposal of municipal, residential and industrial waste. Waste was burned at the landfill until 1973. After that date, it was sorted by type and deposited in designated areas. The site was designated a National Priority Site in 1984. From 1950 to 1967, Pratt & Whitney, a wholly owned subsidiary of UTC, deposited its liquid and solid wastes in the landfill.
1. Site Operations. Pratt & Whitney brought three types of chemical wastes to the site: (1) electro-chemical machining sludges containing sodium chloride, sodium nitrate and metallic hydroxides; (2) alkali residues from cleaning tanks which contained caustic soda, potassium permanganate, alkali rust remover, and acidic scale conditioner; (3) masking wax with degreasing solvents, including trichlorethylene. Joint Stipulation as to Facts and Documents with Respect to the Old Southington Landfill Site, pars. 11-14. Trichlorethylene was the major contaminant of Town Well No. 5, which was located only 50 feet from the stream draining Black Pond in the landfill site. Because of this contamination, Town Well No. 5 was taken out of service in 1987, after only nine years of use. Work Plan for remedial Investigation/Feasibility Study at the Old Southington Landfill Site (Work Plan), dated December 1987, at 7 and 9.
After conducting a hydrologic investigation, the United States Environmental Protection Agency concluded that the Old Southington Landfill was the source of volatile organics found in the ground water. Technical Review of Documents, Old Southington Landfill, Draft Final Report, dated June 1985, at 1. Soil and groundwater in and around the landfill were contaminated, not only with trichlorethylene, but also with perchlorethylene, barium, cadmium, chromium, nickel, solvents, toluene, and cyanide. Plaintiffs’ Pretrial Statement, Vol. I, 86.
2. Time Period of Damage. Pratt & Whitney, a subsidiary of UTC, used the landfill from 1950 until 1967. Transcript at 109, lines 22-23, The dumping ended in 1967, but the plaintiffs allege that property damage took place after that time. Consequently, the plaintiffs allege that policies after 1967 are triggered.
3. Pollution Exclusion. Beginning in 1970, the policies contained the Pollution Exclusion. If property damage did occur after 1970, the pollution exclusion would apply.
The London Market policies have an explicit pollution exclusion. If there is to be coverage, the seepage pollution contamination must be caused by a sudden, unexpected and unintended event during the policy period. The plaintiffs’ position that after 1967 there were no events which caused seepage pollution or contamination is inconsistent with coverage under the exception to the London Market pollution exclusion.
4. No Sudden and Accidental Release. The plaintiffs concede that they “are aware of nothing in the record at this site which would indicate that the releases were sudden and accidental under the SCA decision.[19] Transcript p. 112 line 20.
*114 5. Conclusion. Pollution damage occurring prior to October 1, 1970 would be considered under the “accidentally caused” criteria of the policies. After October 1, 1970, coverage would be considered under Endorsement 4, but not under the main body of the policy because no damage resulted from a sudden and accidental incident.
Accordingly, partial summary judgment in favor of the defendants is appropriate based on the Pollution Exclusion for properly damage after October 1, 1970.
PRATT & WHITNEY PLANT East Hartford, Connecticut
This 1000-acre site is the location of a 6.4 million-square-foot plant that has been used since 1930 to manufacture aircraft engines.
1.Site Operations. In the manufacturing process, Pratt & Whitney machines a variety of metals, such as steel, titanium, aluminum and magnesium. Chlorinated solvents are used in the process. Transcript of Hearings on Defendants’ Motions for Summary Judgment (Transcript), June 22, 1992, at 116, lines 13-17. Environmental expert Melvin Schneidermeyer testified, “Based ... on my experience as a Department of Environmental Protection deputy commissioner, there would be an expectation that a metals and machinery manufacturing location over a long period of time would have some contamination.” Deposition of Melvin Schneidermeyer, taken October 4, 1991, Vol. IV at 134, lines 17-22.
There are three principal sources of contamination at the site. The first area is the waste water treatment plant which began operation in 1951. Transcript at 117, lines 1-3. Pratt and Whitney dried liquid sludge from the waste water treatment plant in unlined holes in the ground. Contaminated liquid from the sludge entered the soil and groundwater. Transcript at 117, lines 5-13. “It is probable that [environmental contamination from the landfill] would happen over a long period of time. Dep. of Melvin Schneidermeyer, Vol. IV at 50, lines 6-13.
A second source of contamination is the oil house where new product and waste oil were stored in barrels. Transcript at 117, lines 14-18. Numerous spills at the oil house took place over a long period of time and occurred in the normal course of operations at the plant. Transcript at 120, lines 14-21. These spills allowed solvents to enter the groundwater. Pretrial Statement at 57.
The third area of concern was the North Tank Farm where there were many underground storage tanks. Some tanks had been in the ground since 1929. Transcript at 117, lines 18-21.
When the tanks were excavated and replaced, an employee reported that “some were real leakers"; and that “there wasn’t much left of them when they pulled them out.” Transcript at 121, lines 8-11; Deposition of Arthur Caldwell, taken September 12, 1991, at 167, lines 6-10 and 196, lines 12-13. The release of contaminants occurred over a long period of time as a result of the deteriorated condition of the tanks. Transcript at 122, lines 2-7.
2. Time Period of Damage. Contamination may have begun as early as 1939 when Pratt & Whitney began manufacturing internal combustion engines relying on high-test gasoline. Dep. of Melvin Schneidermeyer, taken October 3, 1991, Vol. Ill at 98, lines 3-8. The plaintiffs claim that property damage commenced in the early 1950s and continued through 1985. Pretrial Statement at 57.
3. No Suit. UTC claims that the directive of a Connecticut DEP official requiring Pratt & Whitney to install monitoring wells near the tank farm and to investigate groundwater contamination at the site is the equivalent of a suit. Pretrial Statement at 57; Plaintiffs' Memorandum in Supplemental Opposition to Defendants’ Motion for Summary Judgment on Fifteen of the Eighteen New England Sites (Supplemental Opposition) at 15-16.
However, the DEP actions do not satisfy the Hazen Paper standards. Here CTDEP has not alleged that it has spent public funds in response to the contamination or that there has been damage to the property of any third party. DEP has directed Pratt & Whitney merely to investigate on-site contamination. Therefore, the DEP consent order is not a suit for damages because of property damage.
The plaintiffs counsel by letter to this court, dated July 15, 1991, requested that this site be removed from the trial list because no suit had been commenced involving damage to third-party property.
4. Conclusion. In the absence of a suit, no coverage is afforded by the main body of the policies or any endorsement thereto.
Summary judgment in favor of the defendants is appropriate on all issues.
PRATT & WHITNEY PLANT Middletown, Connecticut
This 1100-acre site has been used for the manufacturing and testing of jet engine parts since 1966. Prior to 1966, analytical and experimental research on high-temperature nuclear power systems were conducted for the United States Air Force and the Atomic Energy Commission. Plaintiffs Pretrial Statement at 74.
1. Site Operations. Electroplating has been a part of Pratt & Whitney’s manufacturing aircraft manufacturing operations. Transcript at 5, line 10. Electroplating generates wastes which are treated in Pratt & Whitney’s waste water treatment plant. Even after treatment, sludge of hazardous material remains. Transcript at 5, lines 10-14. Pratt & Whitney deposited this sludge in three surface impoundments and a landfill, which were located on the site.
*115 Pratt & Whitney also perform electrochemical machining as part of its manufacturing operation on the site. This process generates electrochemical machining (ECM) sludge, which contains metal hydroxides. The sludge was deposited in an ECM landfill and a metal hydroxide landfill on the site. Transcript at 5, lines 20-24 and at 6, lines 1-5. Finally, degreasing operations, involving the use of chlorinated solvents, were part of Pratt & Whitney’s manufacturing activities at the site.
2. No Sudden and Accidental Release. Since 1970, the main body of the policies contain either the pollution exclusion, the absolute exclusion or Endorsement 4. In the absence of any sudden and accidental releases, only Endorsement 4 may be considered for coverage. The incidents identified by Pratt & Whitney as sudden and accidental were nothing more than releases occurring in the context of a longstanding, pollution-phase operation.
A plume of chlorinated solvent emanates from Building 10, the site of the degreasing operations, and extends into the flood plain of the Connecticut River. These contaminated waters discharge into the river from groundwater and from the surface flow of the wetland. Report of Jeffrey D. Heidtman (Heidtman Report) of Fuss & O’Neill, dated September 14, 1991, at 1. According to Heidtman, who was engaged by Pratt & Whitney as an environmental consultant, “the principal source of contamination is the activities taking place within Building 10,” including “longstanding incidental seepage through the building floor, sumps, pits, and grounds,” which is associated with the process of degreasing and with the storage of degreasing chemicals and wastes. Heidtman Report at 1.
In the 1970s, Pratt & Whitney dug unlined holes in the ground to make its ECM Sludge Landfill. Transcript at 9, lines 2-7. A second contamination plume consists of inorganic salts, trace levels of nickel and chromium, and low levels of VOCs. This plume originates at the ECM sludge landfill and extends to the floodplain of the Connecticut River. Heidtman Report at 2; Transcript at 9, lines 1-2. Heidtman links the contamination to Pratt & Whitney's intentional and long-term disposal of ECM sludge in the unlined landfill pit. Heidtman Report at 2; Transcript at 12, line 7.
Building 150 was the site of Pratt & Whitney’s ECM treatment facilities and of degreasing operations. Transcript at 9, lines 21-24. A third contaminant plume contains hexavalent chromium and VOCs. This plume extends from the site of Building 150 to the Connecticut River and to Production Well 13A. Contamination was first discovered in production Well 13A in 1980. Heidtman Report at 2. “To a reasonable specific certainty contamination was present for several years prior to discovery.” Heidtman Report at 2. The records of historic stage of VOCs and the result is study of hydrologic groundwater flow and velocity are consistent with releases over time, extending back into the 1960s from Building 150. Releases at Building 150 and at the ECM treatment facilities have contributed chromium to the groundwater near the VOC plume. Heidtman Report at 2. Documented releases at Building 150 include the rupture of an ECM sludge pipe, releases of VOCs, and releases of untreated ECM solution in and around Building 150. Transcript at 6, lines 13-17.
The documented contamination was not sudden or accidental. It was the result of Pratt & Whitney’s purposeful and regular use of hazardous chemicals as integral parts of its manufacture of aircraft engine parts and the result of its purposeful and regular treatment and disposal of the hazardous wastes from its manufacturing operations. In the case of the disposal of sludges in unlined pits, the release of leachate containing waste chemicals was fully expected. Transcript at 10, line 8-10. These pits were designed and sited so that the flow of groundwater would take the leachate and its contaminants into the Connecticut River. These areas are contaminated with chromium, a by-product of Pratt & Whitney’s electroplating operation. Transcript at 9, lines 14-1. Because the releases were not sudden and accidental, the policies containing the pollution exclusion would not provide coverage.
3. No Suit. Since 1980, Pratt & Whitney’s handling, usage, storage, and treatment of hazardous waste have been regulated by permits for CTDEP and by RCRA. Between 1980 and 1987, Pratt & Whitney operated under an interim RCRA permit. Effective November 7, 1987, the USEPA issued a permanent Hazardous Waste Management Permit to Pratt & Whitney. In order to comply with the terms of the interim permit and to obtain a permanent permit, Pratt & Whitney has had to investigate and remedy surface and groundwater contamination beneath the facility. Plaintiffs’ Memorandum in Supplemental Opposition to Defendants’ Motion for Summary Judgment on Fifteen of the Eighteen New England Sites (Supplemental Opposition) at 16.
Not all “govemmentally-imposed costs” are damages on account of property damage. According to the court in Hazen Paper, the cost of complying with a governmental agency order directed at damage prevention does not constitute a third-party claim for damages. Hazen Paper Co. v. United States Fidelity and Guar. Co., supra at 696, citing Aerojet-Gen. Corp. v. Superior Court, 211 Cal.App.3rd 216, 237 (1989) (capital improvements to prevent pollution or safely paraphernalia required by government regulation and not actually related to property damage would not be covered). In this case, Pratt & Whitney expended funds “(t]o comply with USEPA directives and to prevent damage to third parties and their property” (emphasis added). Memorandum in Supplemental Opposition to Defendants’ Motion for Summary Judgment on Fifteen *116 of the Eighteen New England Sites (Supplemental Opposition) at 20. Pratt & Whitney admits that no third-parly property damage has been alleged. Compliance with requirements of RCRA permits does not constitute a suit for damages on account of third-party property damage within the meaning of Hazen Paper.
4. Conclusion. In the absence of a “suit,” summary judgment is appropriate in favor of the defendants.
PRATT & WHITNEY PLANT
Southington, Connecticut
This site houses two facilities for Pratt & Whitney. The Manufacturing Division is located on a 52-acre site purchased in 1956 from the government. It operated the plant for the government prior to that time.
The Pratt & Whitney Overhaul and Repair Center is adjacent to the manufacturing plant and is located on 21 acres of leased land.
1. Site Operations. As part of its manufacturing and repair operations, Pratt & Whitney degreased aircraft parts with chlorinated solvents containing TCE, PCE, TCA and methylene chloride. Transcript of Hearing on Motions for Summary Judgment, June 23, 1992, at 34, lines 4-14. Beginning in the 1950s Pratt & Whitney used chromic acid and other metals, such as cadmium, in its metal treatment and metal plant processes. Transcript at 34, lines 15-17. After the Old Southington Landfill closed in 1967, Pratt & Whitney devised several strategies for dealing with hazardous wastes it had previously sent to the landfill. During the period 1967-75, it sent some wastes to its East Hartford plant for processing, or sold them to others for reclamation or hired haulers to dispose of them off-site. While awaiting pick-up for reclamation or disposal, these wastes were stored at various locations on the Southington sites. Between 1975 and 1979, Pratt & Whitney collected a large number of drums of wastes awaiting disposal in the area north of the O & R Center.
2. Time Period of Damage. The property damage began at ieast as early as the 1950s and continued through 1985. Plaintiffs’ Pretrial Statement at 90. Both the leaking of water-based coolant into the soil and groundwater and a polluting solids collection process had been in operation since the early 1950s. Dep. of Klemes at 107, line 9-198. Pratt & Whitney’s environmental expert, Melvin Schneidermeyer, stated that there is a “reasonable probability” that VOCs from solvent use at the site dating from the 1940s to the 1960s caused the contamination. Deposition of Melvin Schneidermeyer, dated October 4, 1991, at 143, line 8.
3. No Sudden and Accidental Release. At its Pratt & Whitney plant in Southington, Connecticut, UTC has documented incidents in which containers of hazardous chemicals developed leaks, were punctured, or were overturned. However, these spills and leaks were not sudden or accidental. They occurred in the course of its operations. Pratt & Whitney’s own environmental expert, Melvin Schneidermeyer, stated that there is a “reasonable probability” that volatile organic compounds from solvent use at the site dating from the 1940s to the 1960s caused the contamination. Deposition of Melvin Schneidermeyer, dated October 4, 1991, at 143, line 8. Unlined waste water treatment pits and a polluting solids collection process which contaminated solid and groundwater on the site had been in operation since the early 1950s. Deposition of James J. Klemes, (Dep. of Klemes), taken August 6, 1991, at 107, line 9-18. When identifiable leaks and spills occur in the course of a routine business operation which is pollution prone, those discrete releases are not sudden and accidental according to the court in Belleville II.
During the routine use of the chemicals in the manufacturing processes and during the routine handling of stored chemicals, there were spills and leaks of chlorinated solvents. At the O & R Center, workers brought TCE into the plant in open buckets from the storage drums, which were located outside, to the east of the building. Deposition of John Borry, taken September 25, 1991, at 27, lines 3-6; Deposition of Edward Parker, dated October 9,1991, at 56, lines 11-23. Spills of solvent on the shop floor were frequent. Borry Dep. at 33, lines 10-15. Spills in the storage area also occurred when workers overfilled the buckets with the solvent such that the bucket would overflow, or the employee would pour excess solvent onto the surface of the storage area. Borry Dep. at 35, lines 2-10. In addition, the spigots of the storage drums often leaked, leaving “obvious signs of spillage” and staining of the ground and pavement under the spigots. Parker Dep. at 57, lines 5-9. In the 1970s, it was commonplace to see solvents splashed on the ground and on the cracked asphalt. Borry Dep. at 37, lines 3-4.
At the manufacturing plant, barrels of degreasing fluid were stored on the south parking lot. Reports of corroding barrels were “ordinary conversation” when employees talked about storage conditions. Deposition of Nevzat Ali, dated September 6, 1991, at 94, lines 14-18. “[Degreasing fluidl would actually corrode [the tanks], and it would get through into the contaminant area . . . usually a concrete foundation . . . [and it] penetrated the concrete.” Ali Dep. at 97, lines 7-18, 25.
Pratt & Whitney dumped liquid sludge, the by-product of its metal treatment and metal plating processes, into unlined lagoons or pits. Transcript at 45. It also impounded sludge from its waste water treatment plant in surface lagoons. These impoundments were purposefully unlined, so that the sludge could collect in the impoundment, and the water could drain off into the ground. Deposition of M.A. Andrew, dated September 18, 1991, at 102, lines 14-17. Treated “sludges of all types, including chrome, cyanide, acid and alkali were dumped into the lagoons.” Andrew *117 Dep. at 144, lines 7-10. Contaminants in the sludge seeped into the soil lining the lagoon. Andrew Dep. at 144, lines 18-21; Transcript at 42, lines 2-12 and at 45, lines 14-24 and 46, line 1.
4.Damage to Property of Third Party. Although Pratt & Whitney has undertaken remediation and monitoring of contaminated solid and groundwater on the plant site, there has been no allegation that damage to third-party property has occurred or is imminent. Although the damage is confined to Pratt & Whitney property, the pollution of groundwater, even on the polluter’s own properly, is pollution of public resources and precludes operation of the owned property exclusion.
Pratt & Whitney’s experts have documented more than eleven areas of contamination at the two Southington sites. In 1987, Goldberg & Zoino Associates, Inc. (GZA) found elevated levels of solvents in the soils and groundwater at the site of solvent storage area east of the O & R Center building. In several wells in this test area, TCE and DCE exceeded recommended action levels for drinking water of the Connecticut Department of Health Services. Containment Source Evaluation, Pratt & Whitney Maintenance Center Facility, Southington, Connecticut, prepared by Goldberg & Zoino Associates, Inc., dated March 1987, (GZA Report) at 6.
In May 1979, Pratt & Whitney removed 505 barrels of chlorinated solvents from the waste solvent storage area north of the O & R Center. GZA report at 3; M.A. Andrew, Memorandum on Southington Well Contamination, History of Solvent Wastes (Solvent Waste Memo) dated April 8, 1980 at 1. Observed levels of eleven VOCs in the groundwater, including ethylene compounds commonly associated with industrial grade tetrachloroethylene, exceeded Connecticut Department of Health action levels and the proposed recommended maximum contaminant level of the EPA. GZA could not determine the source of contamination in the north area. GZA Report at 7.
In September 1991, hydrologist Richard W. Lewis evaluated the history of groundwater contamination at the Southington site. This survey noted that in 1984 soil in the north area of the O & R site was contaminated to a depth of 100 feet with TCE, TCA, and PCE. The presence of 1-2 DCE, a breakdown product of PCE, indicated that the contamination was not from a recent release. Lewis attributed the contamination of the north area to the waste storage operated in the area between 1976 and 1979. Summary Report, Pratt & Whitney, Southington, Connecticut (Groundwater Summary), prepared by Groundwater Technology, September, 1991, at 3-4.
According to the Groundwater Summary, in 1980, tests had revealed TCE and 1-2 DCE in two wells northeast of the manufacturing site. Groundwater Summary at 2. This contamination appeared to come from under the manufacturing plant, which would be consistent with its originating in a leak in a 10,000-gallon tank of TCE in 1966. Groundwater Summary at 3.
In one well south of the manufacturing place, TCA and TCE contamination had been observed in 1980. Between 1980 and 1987, TCE contamination increased at the manufacturing site. The suspected sources of these contaminated releases can be traced to chemicals in the south/southeast comer of the plant. The releases must have occurred before 1973, when use of TCE was discontinued. Groundwater summary at 3.
According to the testimony of James J. Klemes, water-based coolant had penetrated through the surface of another area and had reached the groundwater. Deposition of James J. Klemes (Dep. of Klemes), taken August 6, 1991, at 107, lines 9-12. In August and September 1990, Pratt & Whitney responded with soil analyses, and then excavated 300 yards of soil, asphalt, and concrete. Dep. of Klemes at 107, lines 2-4.
5. No Suit. The costs which Pratt & Whitney has incurred at its Southington site are costs of compliance with environmental regulations. These are not costs incurred because of a suit for damages on account of property damage within the meaning of Hazen Paper. In Hazen Paper, a letter from the Massachusetts DEP required Hazen Paper Co. to take remedial action against the threat of release from overpacked drums of wastes. The court found that the DEP letter, which alleged only threatened releases, not actual damage, and which did not allege expenditure of public funds was not a suit for damages on account of property damages. Id. at 698.
Pratt & Whitney’s costs to modify its waste water treatment plant were incurred to comply with CTDEP’s authorization of an update of the plant in 1984. The costs of monitoring groundwater near sludge lagoons, of closing the lagoons, and of building and operating the Chemical Storage Building were anticipated by Pratt & Whitney when it decided to operate the lagoon and to store chemicals on its site after passage of the RCRA. These costs of regulatory compliance when they are not recoverable under the insurance policies. Hazen Paper, supra at 698.
6. Conclusion. In the absence of a suit, summary judgment is appropriate in favor of the defendants.
SIKORSKY AIRCRAFT PLANT Bridgeport, Connecticut
The seventeen (17) buildings at this 35-acre facility have been used by Sikorsky since 1946 for the manufacture and repair of helicopters and their component parts.
1. Site Operations. From its metal plating and metal finishing operations, Sikorsky regularly released chromium, cadmium, and other wastes onto the floor of Building 10, the metal finishing area. The wastes were washed into a cement trough, which had been con *118 structed in 1951. From the trough the wastes were pumped into a holding tank. The wastes were regularly transferred from the tank to drums and stored on the site until they were collected for off-site dumping. The wastes of the metal finishing area permeated the floor, troughs, and sump, and they leached through these surfaces into the ground. During transfer and storage, these wastes were dripped and spilled onto the ground. Transcript at 60, lines 8-24.
Building 10 also contains a degreasing unit. During regular degreasing operations between 1946 and 1967, PCE was released into the soil and groundwater around Building 10. Transcript at 61, lines 1-7. In 1987, when Sikorsky decided to remove asbestos from Building 10, it also treated the soil and the groundwater around the building for chromium and PCE contamination. Transcript at 61, lines 12-18; Plaintiffs’ Pretrial Statement (Pretrial Statement) at 43.
In 1988, in order to comply with federal and state regulations, Sikorsky removed underground storage tanks (USTs) containing aircraft fuel. Sikorsky also removed five hundred cubic yards of contaminated soil surrounding the tanks. Pretrial Statement at 43; Transcript at 61, lines 19-22.
2. Time Period of Damage. The damage dates from 1951, when Sikorsky built concrete troughs to remove metal finishing wastes from the shop floor.
3. No Sudden and Accidental Release. The plaintiffs admit that there is no record of spills at the plant. Transcript at 63, lines 9-10. Purposefully discarded chemicals from regular metal finishing and degreasing operations conducted over many years caused the contamination in the soil and groundwater at Building 10. Contamination of soil surrounding the underground storage tanks was also the result of the regular and purposeful use of the tanks to store aircraft fuel over a long period of time. Because the plaintiffs cannot demonstrate that contamination was caused by a sudden and accidental release, coverage is barred by the pollution exclusion subsequent to the Liberty policy issued for the period commencing October 1, 1970.
Earlier Liberty policies may afford coverage if all other terms and conditions of the policies are met.
4. No Damage to Third-Party Property. Chromium and PCE contamination was confined to the soil and groundwater on the site under Building 10. Transcript at 64, lines 5-10 and at 65, lines 15-19. Contamination from corroded underground storage tanks was confined to the surrounding concrete containment structure and the underlying soil. There has been no allegation of or investigation into contamination of the property of third parties. Transcript at 66, lines 20-24.
5. No Suit. In their letter to the court of July 15, 1991, the plaintiffs requested an order to remove the site from the trial list, because no suit had been filed within the meaning of Hazen Paper. Transcript at 62, lines 6-9. In this case, Sikorsky voluntarily investigated possible contamination around Building 10 before renovating or demolishing the building. The company voluntarily informed Connecticut DEP and the USEPA of its test results. Transcript at 63, lines 1-3. No state or federal agency has claimed to have spent public funds responding to the contamination and no agency or party has alleged that the contamination has damaged the property of any third party. Merely reporting contamination to state and federal environmental protection agencies does not constitute a suit for damaged within the meaning of Hazen Paper.
6.Conclusion. In the absence of a “suit,” summary judgment in favor of the defendants is appropriate on all issues.
SIKORSKY AIRCRAFT PLANT Shelton, Connecticut
This is a 21-acre site leased by Sikorsky from the Paxtonville Corporation since 1983 and used for overhaul and repair of helicopter components.
1. Site Operations. The overhaul process involves an operation in which parts are immersed in a succession of chemical and water baths to clean paint from these components. Transcript at 69, lines 15-19. One of the chemicals, Intex, is composed of phenol, cresol, dichlorobenzene, TCE, sodium chloride and sodium chromate. Transcript at 69, lines 20-23.
In the reconditioning process Sikorsky employs vapor degreasing and spray painting. Sikorsky contains the dripping of the chemical by-products of manufacturing with pans placed beneath the processing machinery. Transcript at 70, lines 1-6. Floors in the processing areas are washed off into sumps. Waste water from the sumps is pumped into a holding tank.
Following an inspection in August of 1987, the Connecticut Department of Environmental Protection (CTDEP) notified Sikorsky by letter dated November 9, 1987, of the existence of two violations: improper ventilation of spray gun areas and storage of open cans of cleaning solvents. Sikorsky corrected the violations. Transcript at 689, lines 10-13 and at 71, lines 3-9.
The owners of the property, Paxtonville Corporation, demanded by letter of August 25, 1987, that Sikorsky remediate the cadmium contamination at the site. Transcript at 68, lines 14-16. The contamination was discovered during the course of an environmental survey done in connection with a mortgage which the owner was seeking on the property. Sikorsky spent $16,000 to clean up the cadmium contamination of the Paxtonville property. Transcript at 71, lines 20-24. The cadmium contamination of the Paxtonville prop *119 erty is the only alleged damage to third-party property, and it is the only expense for which UTC seeks reimbursement.
2. No Sudden and Accidental Releases. Mark Halvorsen, Senior Environmental Engineer for Sikorsky since 1985, could not determine the timing or source of the cadmium contamination. He admitted that no investigation of cadmium contamination has been made. Deposition of Mark Halvorsen, taken September 18, 1991; Letter from Mark Halvorsen to Patricia D. Braxton, Bankers Trust Co. dated November 2, 1987. The head of Environmental Engineering at Sikorsky since 1986 also testified at his deposition that Sikorsky never knew how the contamination had occurred.
3. No Suit. There has been no formal private or governmental legal action against Sikorsky. Neither the USEPA nor the CTDEP has sent a formal letter notifying Sikorsky that it is a potentially responsible party. Transcript at 68, lines 17-19. Recognizing that there is no suit within the meaning of Hazen Paper, UTC has requested that the Shelton site be removed from the list of sites for which it was demanding insurance coverage. Transcript at 69, lines 20-22; also see Letter of Attorney Birsic dated July 15, 1991, agreeing that there has been no suit.
4. Conclusion. In the absence of a suit, summary judgment is appropriate for the defendants.
SIKORSKY AIRCRAFT PLANT Stratford, Connecticut
This plant, located on 270 acres of land, is owned and operated by Sikorsky and utilized for the manufacture and testing of helicopters.
1. Site Operations. The manufacture of helicopters entails machining of metal parts and sheet metal forming, finishing and electroplating. Transcript at 78, lines 15-20. The manufacturing processes produce hazardous wastes, including chromium, cadmium, nickel, copper, tin, silver, titanium, cyanide, acids, alkalis, and sludges. The fuel and oils Sikorsky used to operate the helicopters during testing are also contaminants. Transcript at 86, lines 15-16. These chemicals have contaminated the soil and groundwater of the plant site which borders the Housatonic River and the Far Mill River. Pretrial Statement at 96.
There are eight particular sources of concern. From 1956 to 1970, Sikorsky operated an unlined landfill on the site in which it disposed of plant waste, including solvents, oils and metal hydroxide sludge. Plaintiffs’ Pretrial Statement at 96-96; Transcript at 81, lines 4-11. Leachate from the landfill has contaminated the soil and may have contaminated the groundwater. The contamination could migrate to the adjacent Far Mill River. Pretrial Statement at 97.
From 1958 until 1990, nine underground storage tanks on the site were used to store fuel for helicopters and ground vehicles. Tanks and the manifolds connecting them leaked during this thirty-two year period. Spills occurred during the regular course of fueling. These spills may have contaminated soil and groundwater in the area of the underground storage tanks. Pretrial Statement at 97.
Sikorsky’s metal plating and metal finishing operations generate wastes which are captured in a system of concrete trenches and conducted to the waste water treatment plant. Pretrial Statement at 97-98. Built in 1956, the trench system has been breached at times in the intervening years, allowing chemicals to enter the soil and groundwater. Pretrial Statement at 98.
Following processing at the waste water treatment plant, sludge was directed to two unlined lagoons for drying. Pipes and trenches which linked the treatment plant to the lagoons leaked at times. Transcript at 86, lines 18-20. Leachate contaminated with electroplating wastes percolated into the ground beneath the sludge lagoons. Transcript at 870, lines 20-24 and 81, lines 1-3. Soil and groundwater contamination was covered in 1983; the lagoons were closed in the late 1980s. Contamination threatens the adjacent Housatonic River, but no actual contamination has been reported. Pretrial Statement at 98.
The Transmission Building, where helicopters are manufactured and tested, is a source of contamination. It was constructed without floor drains. Sikorsky used water mixed with a solvent containing hazardous chemicals TCE and TCA to clean the transmissions after testing and to clean the floor. The mixture of hydraulic oil, cleaning solvent, and water from the cleaning was simply hosed out of the building onto the ground. Transcript at 79, lines 11-24. Interim Corrective Measures Plan, Corrective Action Program, Sikorsky Aircraft, prepared by Charles T. Main (Main report), dated December 1990, at 5-1.
Sikorsky maintained a drum storage area where portable tanks and drums containing sludge and waste oil were stored on an unlined area without containment curbing. Transcript at 81, lines 12-15. Sikorsky admitted that there were releases from corroded and leaking drums and open drain valves. Transcript at 86, lines 9-14.
From 1955 to 1971, Sikorsky stored scrap metal in open dumpsters outside, near the manufacturing building. Transcript at 81, lines 17-19. When Sikorsky employees punctured the bottoms of the dumpsters to release accumulated rainwater and chemicals, they allowed the contaminated liquid to seep into the ground. Transcript at 82, lines 2-5 and 86, lines 7-9. Even after Sikorsky built a shed for scrap metal storage in 1986, some bins remained uncovered until *120 1988, and continued to generate leachate. Transcript at 82, lines 6-11.
From the early 1960s to the early 1980s, Sikorsky allowed a local police athletic association to operate a shooting range on its property. Spent bullets have caused lead contamination in the dirt embankment behind the targets. This contamination lies adjacent to the Far Mill River. Pretrial Statement at 99.
2. Pollution Exclusion. UTC will be unable to establish its right to coverage for any contamination discovered. Its Environmental Coordinator has admitted that there was hydrocarbon contamination of the soil “in the [fuel] area related to surface spills, etc. over the past thirty-two years . . .” Letter of Mark Halvorsen, Senior Environmental Engineer of Sikorsky to Connecticut DEP, dated August 29, 1988; Transcript at 88, lines 22-24. Appendix Vol. 111.6, Part 6 Tab U(8). According to the report of Sikorsky’s consultant, Charles T. Main, Inc., “there were no records found to document any spills or leaks occurring prior to December of 1990, in the hazardous waste drum storage area or in the scrap metal handling area.” Main Report at 2-4, 2-5, 3-3. Without records, Sikorsky will be unable to prove at trial that the releases of contaminants at the Stratford site were sudden and accidental.
3. Owned Property Exclusion. There is no record of off-site contamination. UTC has agreed with government agencies to study the extent of on-site contamination. Transcript at 101, lines 18-22. The known contamination at the Stratford site is excluded from coverage by the owned property exclusion.
4. No Suit. The only suit involving the Stratford site is a complaint against Sikorsky for violation of the Resource Conservation and Recovery Act of 1980 (RCRA). In May 1991, Sikorsky pled guilty to violating RCRA by knowingly and willfully disposing of hazardous waste (flushing water, hydraulic oil, and solvent cleaner directly onto the ground). Sikorsky paid a $3 million fine. Transcript at 83, lines 18-24. The plaintiffs are not seeking coverage for their expenses resulting from the RCRA complaint and guilty plea. Transcript at 91, lines 12-21.
Instead, the plaintiffs claim that the 1987 CTDEP consent order, which requires Sikorsky to close its sludge lagoons in accordance with the provisions of applicable laws and timetables, constitutes a suit. Transcript at 84, lines 1-11; Pretrial Statement at 100.
The CTDEP consent order is part of an ongoing regulation of Sikorsky’s hazardous waste facility. State of Connecticut v. UTC, Sikorsky Aircraft Division, Consent Order HM-412, dated April 15, 1987, and does not constitute a suit according to the Hazen Paper standard. The order requires Sikorsky to comply with normal procedures for closing its regulated units, its hazardous waste lagoons. State of Connecticut v. UTC, Sikorsky Aircraft Division, Consent Order, dated April 15, 1987, at 1. CTDEP has not alleged that it has spent public funds or that there has been contamination of the property of any third party. Therefore, the CTDEP consent order is not a suit for damages.
Sikorsky also claims that the 1990 RCRA consent order is a suit. In re United Technologies Corporation, Sikorsky Aircraft Division, RCRA DKT No. 1-90-1011, dated November 2, 1990. Pursuant to the consent order, U.S. Environmental Protection Agency ordered Sikorsky to investigate and identify areas of contamination and to formulate a remediation plan and to implement interim remedies. Transcript at 85, lines 7-21 and at 98, lines 21-24. However, there has been no claim of damage to the property of any third party. The consent order directs UTC to inquire about the extent to which contamination has migrated from the site. EPA has not incurred response costs. Therefore, the consent order does not constitute a suit for damages on account of third-party property damage.
If UTC fails to comply with the consent order, it is subject to a fine of $25,000 per day. In the event UTC fails to comply, EPA has reserved the right to seek enforcement of the consent order in Federal District Court and to respond to the contamination with its own remediation under CERCLA. Unless the EPA alleges damages and incurs response costs, or commences an enforcement action, there is no suit for damages or suit within the meaning of Hazen Paper.
InApril 1992, UTC brought an action in the Federal District Court in Connecticut against its first-party property insurers seeking coverage at this site. Transcript Vol. 2, at 101.
5.Conclusion. Given the absence of a “suit,” summary judgment for the defendants is appropriate.
UNITED TECHNOLOGIES AUTOMOTIVE PLANT Springfield, Massachusetts
This plant, acquired by UTC on July 14, 1978, from Ambec Industries, manufactured diesel fuel injection components. It had been used as a manufacturing site for many years prior to 1978.
1. Site Operations. The manufacturing processes included machining of various metals, punching operations, deburring, plating, heating, grinding, and degreasing.
2. Time Period of the Damage. According to the trial testimony of plaintiffs’ expert, Richard W. Lewis, President of Groundwater Technology, Inc., chlorinated solvent contamination at the UTA site did not occur before the early 1970s. Trial Transcript, October 31, 1991, Vol. 7, at 130-31. Lewis estimated that oil contamination around the manufacturing building occurred beginning in the early 1980s, or, possibly, in the late 1970s. Trial Transcript, Vol. 7, at 124 and 158. Lewis testified that property damage caused by hydrocarbon contamination near the Research Building did *121 not occur until 1984. Trial Transcript, Vol. 7, at 118-19.
3. No Sudden and Accidental Releases. The plaintiff based its case before the jury on its ability to prove that the actual property damage occurred in the 1984-1985 policy year. Trial Transcript, Vol. 4, at 30, line 16. Following a four-day trial on the issue of whether releases of hazardous materials were sudden and accidental on November 4, 1991, the jury determined that there were no sudden and accidental releases at the site.
4. No Pre-acquisition Coverage. The plaintiffs claim that there is coverage for contamination at the UTA site under policies that do not contain the pollution exclusion. These policies were issued prior to 1970, and they antedated UTC’s acquisition of the site on July 14, 1978. For the reasons given below, UTC does not have coverage for this site under the policies in place prior to 1970. None of the pre-acquisition policies includes any of the previous owners of the Springfield facility as named insureds. The Liberty policies explicitly limit coverage to entities that were acquired by UTC during the policy period. UTC did not acquire Ambec until 1978, years after these policies had expired. A second group of policies limits coverage to the named insured and entities and affiliates of which the insurer is given prompt notice. UTC could not give notice to any insurer of its acquisition of Ambec until 1978. Notice given years after expiration of the policies is not prompt notice.
To require the insurer to provide coverage for damage caused by an entity other than the insured under policies issued to the insured when the insured neither had nor could have foreseen any legal or factual relation to the property would impose an unjust obligation on the insurer for risks it could not possibly evaluate.
Finally, even if pre-acquisition coverage were allowed by this court, there could be no coverage for the Springfield site under any policy that was issued prior to the early 1970s, because plaintiffs admit that the damage took place no earlier than the early 1970s. Such policies contain the pollution exclusion which would bar coverage for the contamination at the UTA site. Transcript of Hearing on Defendants’ Motion for Summary Judgment, June 23, 1992, at 108-09.
5. Conclusion. There is no coverage for property damage at the UTA/Springfield site under policies issued prior to UTC’s acquisition of the site. Even if pre-acquisition policies could be required to respond, the jury found that there were no sudden and accidental releases and the plaintiffs own expert testified at trial that damage occurred during periods when these policies contained a pollution exclusion which would bar coverage.
Endorsement 4 in the policies for the period July 14, 1978 to October 1, 1984 may be considered for coverage if all other terms and conditions are met.
Accordingly, partial summary judgment is appropriate in favor of the defendants based on the Pollution Exclusion.
THE WINTHROP LANDFILL Winthrop, Maine
This twenty-and-one-half-acre site of a former gravel quarry became the landfill dump for the Town of Winthrop, Maine in the 1930s. Until 1972, it was an open-burning dump, and received both municipal garbage and industrial waste. From the early 1950s into 1975, the Inmont Corporation manufactured vinyl-coated fabrics in Winthrop and disposed of much of its manufacturing waste at the landfill. Plaintiffs Pretrial Statement at 108.
1. Site Operations. For over twenty years Inmont employees loaded between 9 and 12 fifty-five-gallon drums of industrial wastes from the plant onto trucks, two or three times a week, and transported them to the landfill. At the landfill they dumped the contents on the ground and burned the wastes. Transcript at 119, lines 3-8, 17-21. After burning was banned in 1972, Inmont deposited its chemicals in the landfill in drums or as free waste. Pretrial Statement at 108. Between 1972 and 1975, 3.3 million gallons of wastes were dumped and between 100,000 and 330,000 gallons were burned in drums.
From the 1950s onward, Inmont dumped contaminants in and around the landfill including (1) solvents, such as dimethyl formamide, tetrahydrofuran and toluene; (2) resins, such as polyvinyl chloride; (3) plasticizers, such as dioctyl phthalate; or (4) products of the combustion and degradation of these chemicals. Plaintiffs Pretrial Statement at 109.
2. Time Period of Damage. Inmont contributed hazardous wastes to the landfill from the early 1950s through part of 1975.
3. No Pre-Acquisition Coverage. In 1979, when it purchased Carrier Corporation, UTC acquired Inm-ont. When UTC sold Inmont to BSAF, UTC retained Inmont’s liability for the contamination from the Winthrop plant. Pretrial Statement at 110; Transcript of Hearing on Motions for Summary Judgment, June 23, 1992, at 122, lines 1-4. During the period 1950 to 1975, when Inmont dumped the polluting chemicals at the Winthrop Landfill, UTC had no connection with Inmont. Inmont was not listed as a named insured on the UTC policies before UTC acquired the corporation. In fact, UTC never had a connection with Inmont’s plant in Winthrop, Maine, which generated the contamination at the landfill. That plant had been sold to local investors in 1978, before UTC bought the Inmont Corporation.
*122 4. Damage to Third-Party Property. The contaminants in the landfill and in the environment near it are those which Inmont used in its operations and which it discarded at the Winthrop Landfill. These contaminants leached from the landfill underground into the neighboring wells. Pretrial Statement at 108. UTC admits in its 1984 consent decree with U.S. EPA and its 1986 consent decree with Maine DEP that chemical wastes from the former Inmont plant caused all or substantially all of the contamination in and around the landfill. Pretrial Statement at 110; Transcript at 119, at 23-24 and 120, at 1-2.
5. No Sudden and Accidental Release. For over 20 years Inmont repeatedly and regularly dumped its hazardous waste chemicals at the Winthrop landfill. The plaintiffs concede that “on the issue of sudden or abrupt events under the SCA standard,[20] the plaintiffs have identified no events that they know of at Winthrop which would constitute a sudden or abrupt event.” Transcript at 123, lines 3-7.
6. Conclusion. During the period 1950 to 1975, when Inmont dumped polluting chemicals at the Winthrop Landfill, UTC had no connection with Inmont, and the UTC insurance policies for that period do not extend coverage to an unnamed and unrelated entity. UTC did not acquire Inmont until 1979. The insurance policies covering UTC from 1970 onward contain the Pollution Exclusion or, after 1984, the Absolute Pollution Exclusion. Because UTC admits that there has been no sudden and accidental release at the Winthrop Landfill, the pollution exclusions will bar coverage for any damage occurring during its ownership of Inmont.
Endorsement 4 providing coverage for gradual pollution may be considered for coverage for the period after acquisition.
Accordingly, partial summary judgment is appropriate in favor of the defendants on the issue of the Pollution Exclusion.
ORDER
Accordingly, for the reasons set forth above, it is ORDERED that entry be made
1.Declaring that there is no suit and no coverage under the provisions of the Liberty insuring agreements relative to the following nine (9) sites:
East Granby Landfill, East Granby, Conn.
Essex McCallen Plant, Newmarket, N.H.
Hamilton Standard Plant, Windsor Locks, Conn.
Pratt & Whitney Plant, East Hartford, Conn.
Pratt & Whitney Plant, Middletown, Conn.
Pratt & Whitney Plant, Southington, Conn.
Sikorsky Aircraft Plant, Bridgeport, Conn.
Sikorsky Aircraft Plant, Shelton, Conn.
Sikorsky Aircraft Plant, Stratford, Conn.
As to these sites, summary judgment is granted in favor of the defendants against the plaintiffs on all issues.
2. Davis Liquid Waste Disposal Site, Smithfield, Rhode Island.
Declaring that the pollution exclusion and the absolute pollution exclusion of the Liberty insuring contracts bar coverage under the main body of the contracts but coverage for gradual pollution resulting in property damage between 1975 and October 1, 1984 may be available under Endorsement 4 if all other provisions and terms of the policies are met.
Granting partial summary judgment in favor of the defendants on the issue of the pollution exclusion and the absolute pollution exclusion.
3. Keefe Environmental Site, Epping, New Hampshire.
Declaring that the pollution exclusion provision of the Liberty policies have no application to operations in the State of New Hampshire for the periods October 1, 1975 to October 1, 1980 and October 1, 1984 to October 1, 1985.
Declaring that coverage under the main body of the Liberty policies for the period October 1, 1980 to October 1, 1984 is not provided because of the pollution exclusion.
Declaring that there is no coverage after October 1, 1985 when the absolute pollution exclusion was effective.
Declaring that coverage for gradual pollution may be available for the period October 1, 1975 to October 1, 1980 pursuant to Endorsement 4 if all other provisions of the policies are met.
Granting partial summary judgment in favor of the defendants based on the pollution exclusion for the period October 1, 1980 to October 1, 1984 and the absolute pollution exclusion thereafter.
4. Newmarket Landfill, Newmarket, New Hampshire.
Declaring the rights of the parties as set forth above for the Keefe Environmental Site and further
Declaring that the Liberty policies provide no coverage for property damage occurring prior to the acquisition of Essex by UTC in 1974.
Declaring that coverage for gradual pollution may be available for property damage occurring between 1974 and October 1, 1980 under Endorsement 4 if all other provisions of the policy are met.
Declaring that the pollution exclusion bars coverage for the period October 1,1980 and October 1,1984 and the absolute pollution exclusion thereafter.
Granting partial summary judgment in favor of the defendants based on the pollution exclusion for the period October 1, 1980 to October 1, 1984 and the absolute pollution exclusion thereafter.
*123 Denying partial summary judgment for property damage occurring between October 1, 1975 and October 1, 1980 based on the pollution exclusion.
5. Old Southington Landfill, Southington, Connecticut.
Declaring that the pollution exclusion bars coverage for the period October 1, 1970 to October 1, 1984.
Declaring that policies covering property damage occurring prior to October 1, 1970 may provide coverage if all other terms of the policies are met.
Declaring that Endorsement 4 may provide coverage for gradual property damage occurring between October 1, 1970 and October 1, 1984.
Granting partial summary judgment in favor of the defendants based upon the pollution exclusions for property damage occurring between October 1, 1970 and October 1, 1985.
6. The Winthrop Landfill, Winthrop, Maine.
Declaring that the Liberty insuring agreements covering the period of time prior to the acquisition of Carrier Corporation by UTC in 1979 do not provide coverage for property damage resulting from pollution.
Declaring that the pollution exclusions contained in the Liberty policies bar coverage between 1979 and October 1, 1985.
Declaring that coverage for gradual property damage resulting from pollution may be available under Endorsement 4 from 1979 to October 1, 1984 if all other requirements of the policies are met.
Granting partial summary judgment in favor of the defendants based on the pollution exclusion for coverage under the main body of the policies but denying summary judgment on the issue of coverage under Endorsement 4 for the period between 1979 and October 1, 1984.
7. United Technologies Automotive Plant, Springfield, Massachusetts.
Declaring that the Liberty policies do not furnish coverage for the pollution caused property damage prior to the acquisition of UT Automotive by UTC on July 14, 1978.
Declaring that in the absence of any sudden and accidental release of contaminants as determined by a jury verdict on December 5, 1991, there is no coverage under the main body of the policy.
Declaring that coverage may be available for the period July 14, 1978 to October 1, 1984 for gradual pollution under Endorsement 4.
Granting partial summary judgment in favor of the defendants on the issue of the pollution exclusion.

 In contrast to “occurrence” based policies, “claims made” policies offer coverage for claims made within the policy period. See Hoppy’s Oil Serv., Inc. v. Insurance Co. of N. Am., 783 F.Supp. 1505 (D.Mass. 1992).

 The court in Aerojet declared that covered damages were limited to costs causally related to property damage. They would not include expenditures required by consent decree to prevent future pollution of a type which has not yet occurred, orto prevent pollution from a source which has not yet caused pollution. Capital improvements to prevent pollution where there is none, or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered. Id. at 238.

 Liberty argues that the phrase “as interests appear” related to the phrase “the aforementioned corporation” and provides for the possibility that “aforementioned” corporate entities may not have the form of a corporation.

 For a better view of the concept, see Merrifield v. Lombard, 13 Allen 16 (1866), and a dissention appearing in Annot., 39 A.L.R.3d 910 (1971 & Supp. 1992), entitled Landowner’s Right to Relief Against Pollution of His Water Supply by Industrial or Commercial Waste.

 A federal judge reviewing Rubenstein declared that in the context of a policy containing a pollution exclusion clause the application of a continuous trigger theory would logically preclude plaintiff from asserting that the release of oil was sudden and accidental. Hoppy's Oil Serv., Inc. v. Insurance Co. of N.Am., 783 F.Supp. 1505, 1509 (D.Mass. 1992). In the instant case, in order to establish coverage under the main body of the policy the plaintiffs must prove that the releases causing the damage to third-party property was sudden and accidental.

 In a New York personal injury products liability case the Circuit Court of Appeals for the Second Circuit modified and affirmed the application of the injury-in-fact theory, holding that an occurrence of a personal injury is “any point in time at which a finder of fact determines that the effects of exposure to a drug actually resulted in a diagnosable and com-pensable injury.” American Home Prods. Corp. v. Liberty Mut Ins. Co., 748 F.2d 760, 766 (2d Cir. 1984), affirming and modifying American Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F.Supp 1484, 1489 (S.D.N.Y. 1983).

 Absent ambiguity in the terms of the policy, a court may not interpret the policy language to give effect to what it considered to be the intention of the parties. Reliance Ins. Co. v. Aetna Casualty and Sur. Co., 393 Mass. 48, 52 (1984); Rosenkranz, The Pollution Exclusion Clause Through the Looking Glass, 74 Georgetown L. Rev. 1237, 1278-81 (1986) (public environmental goals are ultimately undercut by disregarding policy language to impose costs on the deepest pockets).

 One underwriter, who had been employed by Liberty since the 1940s and was Director of Large Accounts from the late 1970s until 1985, claimed both that the date of the last exposure of damage continuing over two policy periods would be the second policy year and that the “last exposure” was the last day of activities by the insured giving rise to the loss. Deposition of Grace I. Shaffer, taken July 25, 1991 at 189, lines 19-24 and 190, lines 1-6 and at 201 lines 8-18.

 Liberty Mut Ins. Co. v. SCA Servs., Inc., 412 Mass. 330 (1992).

 Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330 (1992); Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675 (1990).

 Because the contaminants enter the river where it is tidal, brackish, and unfit for drinking, the criterion for action would be that the contamination had no adverse effect on *124 biota. There is no such evidence, and there is no need for remedial action.

 The plaintiffs’ statement in their affidavit that the wastes were stored and dumped in good faith is irrelevant to any determination of coverage under the policies.

 The CTDEP Orders No. WC2925, dated November 4, 1980, No. HM-160, dated May 17, 1984, and No. HM-170, dated May 31, 1984, articulated Hamilton Standard’s duty to investigate, monitor and remediate groundwater pollution resulting from its chemical storage facility, fire training area, sludge lagoons and hazardous waste landfill. Following an administrative appeal of the Order HM-170, the CTDEP Consent Order, dated August 13, 1986, specified that the duty to monitor groundwater pollution under the previous order included a duty to monitor the water in four off-site wells. The Consent Order suggests that off-site contamination had not yet occurred as of August 13, 1986.

 Liberty Mutual Insurance Co. v. SCA Services, Inc., 412 Mass. 330 (1992); Lumbermen’s Mutual Casualty Co. v. Belleville Industries, Inc. 407 Mass. 675 (1990).

 In addition foreign insurers, such as London Market insurers, have no obligation to make filings in New Hampshire and are not bound by the rulings of the Commissioner of Insurance.

 Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. 330 (1992).

 Liberty Mut Ins. Co. v. SCA Servs., Inc., 412 Mass. 330 (1992).

 Liberty Mut Ins. Co. v. SCA Servs., Inc., 412 Mass. 330 (1992).